FILED
04/16/2021
Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
November 4, 2020 Session[1]

## STATE OF TENNESSEE v. MICHAEL RIMMER

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**Nos. 98-01033, 98-01034   Chris Craft, Judge**

———————————————————

### No. W2017-00504-SC-DDT-DD

———————————————————

This is a direct appeal in a capital case.  The defendant had one prior trial.  In the second trial, a Shelby County jury found the defendant guilty of first degree premeditated murder, murder in the perpetration of robbery, and aggravated robbery.  He was sentenced to death plus a consecutive eighteen years of incarceration.  The Court of Criminal Appeals affirmed the convictions and the sentence.  We now consider the appeal on automatic review pursuant to Tennessee Code Annotated section 39-13-206(a)(1).  We hold the following: (1) based on sequential jury instructions given in the first trial, the first jury did not have a full opportunity to consider the felony murder count, so double jeopardy principles did not bar retrial on the felony murder count; (2) alleged prosecutorial misconduct in the first trial did not trigger double jeopardy protections and did not bar retrial of the defendant; (3) because the State did not have a duty to preserve the defendant's vehicle, the trial court did not err in denying the defendant's motion to suppress DNA evidence from the vehicle; (4) the trial court did not err under Tennessee Rule of Evidence 404(b) in admitting evidence of the defendant's prior convictions for rape and assault of the victim; and (5) the trial court did not err under Rule 404(b) in admitting evidence of the defendant's escape attempts and corroborating evidence of homemade shanks in his cell.  We hold further that imposition of the death penalty is not arbitrary, given the circumstances of the crime; that the evidence supports the jury's finding that the State proved one aggravating circumstance beyond a reasonable doubt; that the evidence supports the jury's conclusion that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt; and that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.  As to the remaining issues raised by the defendant, we agree with the conclusions of the Court of Criminal Appeals and attach as an appendix to this opinion the relevant portions of the intermediate court's decision.  We affirm the convictions and the sentence.

---

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

**Tenn. Code Ann. § 39-13-206(a)(1) (2018) Appeal; Judgment of the Court of Criminal Appeals Affirmed**

HOLLY KIRBY, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., CORNELIA A. CLARK, and ROGER A. PAGE, JJ., joined. SHARON G. LEE, J., filed a concurring opinion.

Paul Bruno (on appeal and at trial), Murfreesboro, Tennessee, and Robert Parris (on appeal and at trial), Memphis, Tennessee, for the appellant, Michael Dale Rimmer.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Andrew C. Coulam, Senior Counsel; Pamela Anderson and Rachel Sobrero, District Attorneys General *Pro Tem*, for the appellee, State of Tennessee.

Michael J. Passino, Nashville, Tennessee, for Amicus Curiae Amnesty International, Nashville.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

On February 8, 1997, the victim in this case, Ricci Lynn Ellsworth, disappeared from the Memphis Inn in Shelby County. She left behind her purse, her wedding band, her car, and a chaotic and bloody crime scene. Although the victim was a dependable employee and devoted wife, grandmother, mother, and daughter, neither her employer nor her family ever heard from her again. The victim's body was never located, and she is presumed dead.

The lengthy procedural history in this case includes two trials and three sentencing hearings. At the first trial in 1998, a jury convicted the Defendant, Michael Dale Rimmer, of first degree murder, aggravated robbery, and theft of property. The Defendant received a sentence of death. The State had also charged the Defendant with first degree felony murder during the perpetration of a robbery (felony murder), but the jury did not return a verdict on that count.

On appeal, the Court of Criminal Appeals affirmed the convictions, but it reversed the death sentence due to numerous errors related to the aggravating circumstances considered by the jury. It remanded the case for a new sentencing hearing. *See State v. Rimmer*, No. W1999-00637-CCA-R3-DD, 2001 WL 567960, at \*23 (Tenn. Crim. App. May 25, 2001).

On remand, a second jury imposed the death penalty. On direct appeal, the Court of Criminal Appeals affirmed the sentence. *State v. Rimmer*, No. W2004-02240-CCA-R3-DD, 2006 WL 3731206, at *28 (Tenn. Crim. App. Dec. 15, 2006), *perm. app. granted*, (Tenn. Aug. 13, 2007). This Court affirmed the sentence as well. *See State v. Rimmer*, 250 S.W.3d 12, 18 (Tenn. 2008).

The Defendant then sought post-conviction relief, alleging ineffective assistance of counsel and prosecutorial misconduct. The post-conviction trial court concluded the Defendant was not entitled to relief on his claims of prosecutorial misconduct. However, it granted post-conviction relief on the ineffective assistance of counsel claims and ordered a new trial and sentencing hearing. The State did not appeal.

In advance of the Defendant's second trial, he filed a number of pretrial motions. They included a motion to dismiss the felony murder count, which the trial court denied; a motion to suppress DNA evidence, which the trial court partially denied; and a motion to suppress Rule 404(b) evidence, which the trial court partially denied.

The second trial commenced on April 28, 2016.[2] The jury heard evidence that, years earlier, the Defendant and the victim had been in a tumultuous romantic relationship. Though it ended, they remained in contact. In 1989, the Defendant assaulted and raped the victim inside her home. He eventually pled guilty to burglary in the first degree, aggravated assault, and rape. He received a lengthy prison sentence. According to the victim's daughter, Tracye Ellsworth Brown,[3] and the victim's mother, Marjorie Floyd, the victim was too forgiving toward the Defendant after the rape. She continued to interact with him and even visited him in prison.

During his incarceration for rape and assault of the victim, the Defendant met William Conaley. Mr. Conaley was a childhood friend of the victim's niece. The Defendant learned the victim and her son had received a sum of money in settlement of a personal injury claim. The Defendant was angry at the victim and felt entitled to a portion of the settlement. The Defendant told Mr. Conaley to tell the victim's niece to let the victim know that if he, the Defendant, did not get the settlement money to which he felt entitled, he would kill the victim upon his release from prison. Mr. Conaley relayed the message by letter and in person. According to Mr. Conaley, whenever the Defendant talked about the victim, he would get agitated, sweat, work himself up, wring his hands, and saliva would build up in the corners of his mouth.

---

[2] The facts and evidence summarized in this opinion are from the April 2016 trial.

[3] The victim's daughter is also referred to in the record as Tracye Ellsworth, and at times her first name is spelled "Tracy" or "Tracey."

During this same incarceration, the Defendant also met Roger Lescure. In 1996, while he and Mr. Lescure were working together in the prison, the Defendant talked to Mr. Lescure about the victim and said he was going to "kill the funky bitch" after his release. The Defendant described to Mr. Lescure how to get rid of dead bodies: "Put them in a barrel and put lime in them, it eats the bones and all up." Mr. Lescure said that, when the Defendant talked about killing the victim, he got "high strung" and "into talking about it" and would "sort of foam at the mouth."

After he was released from prison, the Defendant and the victim continued to interact. One afternoon, the Defendant's father came home from work to find the Defendant changing the oil in the victim's vehicle. The Defendant's father got angry that the Defendant was maintaining a relationship with the victim because he felt it would lead to more problems.

In 1997, the Defendant worked at Ace Automotive Collision Center[4] with Howard Featherston[5] and James Wilcox. During that time, he commonly wore a baseball cap. According to Mr. Featherston, the Defendant also had a tattoo on his arm.[6] In addition to working with Mr. Featherston at the collision center, the Defendant worked on vehicles with Mr. Featherston at Mr. Featherston's home. At the time, Mr. Featherston owned a maroon Honda Accord. On January 4, 1997, the Accord was driven away from Mr. Featherston's home and was never returned.[7]

On Friday, February 7, 1997, the Defendant did not have enough money for gas. His coworker at the Collision Center, Mr. Wilcox, followed the Defendant to the gas station and put five dollars' worth of gas in his car so the Defendant could cash his February 6, 1997 paycheck. On that day, Mr. Wilcox recalled, the Defendant was driving a maroon Honda. He expected the Defendant to repay him the five dollars when he came to work the following Monday, since the Defendant was scheduled to work the week of February 10. However, the Defendant never returned to the Collision Center, not even to pick up his paycheck for the shift he worked on February 7.

---

[4] At trial, the Defendant's prior employer was also referred to as Adesa.

[5] The last name of Howard and Cheryl Featherston is at times referred to in the record as "Featherstone."

[6] The Defendant revealed tattoo-free arms to the jury at trial.

[7] In addition to the charges at issue, the grand jury indicted the Defendant for theft of Mr. Featherston's maroon Honda. This charge was originally consolidated with the Defendant's indictments for aggravated robbery and first degree murder. Prior to the second trial, on the Defendant's motion, the trial court severed the theft charge, so the jury in the second trial did not hear proof related to it.

Also on Friday February 7, after he left work at the Collision Center, the Defendant went to the home of his brother, Richard Rimmer, in Mississippi. He drank some beer and talked about a date he had planned later that night.

The same night, the victim left the home she shared with her husband, Donald Eugene Ellsworth,[8] for her work as a night clerk at the Memphis Inn. She was scheduled to work from 11:00 p.m. to 7:00 a.m. The victim parked her vehicle in the motel parking lot and began her shift, working in an enclosed office in the motel lobby behind a locked door. Her interactions with guests were from behind protective glass, and monetary transactions occurred via a drawer under the glass window; money and credit cards were placed in the drawer and slid under the glass. In the same vicinity, the motel had change and vending machines.

Devata Brown was a guest at the Memphis Inn the night of February 7, 1997. She described the motel as being in a "high traffic" location where drug dealing and prostitution may have occurred.

Around 1:40 a.m. that same night, another motel guest, Dr. Ronald King, went to the vending machine area. He noticed a maroon car pull up and park close to the night entrance. A white man wearing a baseball cap with a scraggly beard and unkempt hair walked into the area behind him and approached the motel's check-in area. The night clerk appeared to know this individual and walked to the night entrance door toward him. Once Dr. King finished getting his snacks from the vending machine, he nodded to the desk clerk and left.

Another guest at the Memphis Inn the evening of February 7, Natalie Doonan, came downstairs to buy cigarettes from a vending machine. She noticed a female night clerk working at a counter behind glass. Around 2 a.m., one or two men walked into the motel lobby where the night clerk's office was located; one of the men had a dark complexion and wore his hair in a ponytail. Ms. Doonan finished buying her cigarettes and went back to her room. About thirty minutes later, Ms. Doonan called the night clerk to request a wake-up call. She let the phone ring for ten to fifteen minutes but never got an answer. Ms. Doonan later identified one of the men she saw in the motel lobby as Billy Wayne Voyles.

Around 1:30 or 2:00 a.m. that same night, James Darnell and Dixie Presley drove to the Memphis Inn. Mr. Darnell parked close to the night entrance. He saw a man with a beard and wearing a baseball cap standing behind a maroon Honda parked about four spaces away. In his arms, the man cradled something thick that had been rolled up in a

---

[8] The trial transcript identifies the husband as "Eugene Donald Ellsworth," but he states in his testimony that his name is Donald Eugene Ellsworth.

blanket. When the man placed the item in the trunk of the car, the vehicle sank from the weight of the object.

As Mr. Darnell walked toward the night entrance, the man began walking quickly behind him. They approached the night entrance at the same time, so Mr. Darnell opened the door, said "after you," and let the man go through the door first. As he did, Mr. Darnell noticed the man smelled like alcohol and had blood on his hands. Mr. Darnell walked in behind the man and saw the night clerk's door wide open. As Mr. Darnell walked toward the night clerk's window, he saw another man standing on the other side of the glass pushing cash out through the drawer under the window. The other man also had blood on his hands. Mr. Darnell quickly turned around and left.

Mr. Darnell later positively identified the man behind the counter as Billy Wayne Voyles. He indicated the Defendant "looks like" the man he let go ahead of him through the night entrance door.

During that time, Raymond Summers was a yard master with CSX Transportation ("CSX"). Under an agreement between CSX and the Memphis Inn, CSX employees stayed at the motel during layovers. Mr. Summers was working early the morning of February 8, and the CSX crew staying at the motel was needed back at the train yard for departure. He called the Memphis Inn night desk around 3:00 a.m. to get in touch with the crew members. When the clerk did not answer, Mr. Summers drove to the motel.

When he arrived, Mr. Summers saw that the night entrance double doors, typically closed and locked, were open. He walked into the office and noticed the register drawer was out and papers were scattered on the floor. He called out and got no answer. He then walked toward the sound of running water. As he went into the employee bathroom, Mr. Summers saw water running in the bathroom sink, blood on the sink basin, and that the toilet seat had been removed. There was blood on the toilet and a bloody towel on the floor.

Mr. Summers left immediately to find help. As he was driving to a nearby service station to notify the police, he saw two Shelby County Sheriff's Office ("SCSO") patrol cars leaving a nearby parking lot. He got the officers' attention and told them something strange had happened at the Memphis Inn. They went to the scene.

When they arrived at the motel, the SCSO officers secured the scene and contacted Memphis Police Department ("MPD") dispatch. SCSO officers then notified the motel manager, Linda Spencer, that there was no night clerk at the motel. Ms. Spencer resided in an apartment on the property. She walked to the front of the motel and noticed the night entrance door, normally locked, was open. She went into the employee bathroom and saw

blood all over the floor and walls. The toilet lid had been ripped from the toilet. There was an out-of-place glass on the sink, a flashlight in the sink, and a crack in the sink. Once MPD officers arrived, the SCSO officers left.

Ms. Spencer and the MPD officers looked for the victim inside the motel, to no avail. The victim's car, however, was still parked in the same spot in the parking lot where it had been all night. Ms. Spencer noticed that all the money had been taken from the register, as well as the money in the lockbox. In total, about $600 was missing. There was blood on the floor of the office and a trail of blood leading from the office to the bathroom. There was a towel on the office floor that did not belong there, and about four or five sets of sheets were missing from a cabinet in the office. The motel office had a security camera, but because there was no videotape in it, Ms. Spencer did not check to see if anyone had tampered with it.

MPD officers took photographs of the crime scene, dusted for fingerprints, collected and tagged evidence, and completed paperwork. The items they collected included the victim's wedding band, which she normally wore every day. All items with blood on them were gathered as evidence. Samples were taken from blood on the bathroom floor, the top of the commode, the frame of the door to the snack room, the frame of the door to the west exit, and the door facing the security window. The lid of the toilet was covered in blood and damaged as though it had been used to beat somebody; the toilet lid and a few other items were chemically processed for fingerprints.

Mark Goforth worked as a security guard at the neighboring Super 8 Motel. Like Ms. Brown, Mr. Goforth described the Memphis Inn as a place known for prostitution and drugs. In his work as a security guard, Mr. Goforth often walked the perimeter of the Super 8 property, and in doing so he had gotten to know the victim. Working early the morning of February 8, Mr. Goforth saw MPD officers at the Memphis Inn, so he walked over to the motel. Once he got there, he observed a lot of blood, including a bloody handprint on the counter. Mr. Goforth briefly spoke with the officers and left.

While working at the Super 8 Motel, Mr. Goforth sometimes saw a white man in his early thirties with brownish-blonde hair and stubble at the Memphis Inn talking and laughing with the victim inside her office. He last saw the man a couple days before the victim's disappearance.

Mr. Goforth was shown a composite sketch of two suspects, one wearing a baseball hat and one without a hat. Mr. Goforth identified the man in the hat as a construction worker who frequently stayed at the Memphis Inn while in town to work on a nearby highway construction project.

Around 2:30 a.m. the night of the victim's disappearance, MPD officers went to the victim's home and awakened her husband, Donald Eugene Ellsworth, to see if the victim was there. He told them he had not seen the victim since she left for work earlier that night, so the officers asked him to give a statement. Mr. Ellsworth then accompanied the officers first to the crime scene, where he stayed in the patrol car, and then to the station. While at the crime scene, he noticed the victim's car in the parking lot.

The morning of February 8, the Defendant returned to the home of his brother, Richard Rimmer. He was driving a wine-colored Honda Accord.[9] The brother's home was in a wooded area, close to a pond. When he arrived, the Defendant was wearing muddy white tennis shoes; Richard Rimmer made him remove the shoes and wash them in the bathroom. The Defendant seemed tired and unfocused, "like he was out in left field." The Defendant asked his brother Richard if he could lay on his floor to rest; Richard said no and asked him to leave.

The Defendant's brother Richard worked as a carpet and upholstery cleaner. The Defendant asked his brother to clean the interior of the Honda, including mud on the floorboard and blood in the backseat. The Defendant explained the blood resulted from his having had sex in the backseat with a woman who was menstruating. Richard Rimmer looked inside the car and thought part of the back seat looked dark, like there could have been a bloodstain. He noticed mud in the car and a new-looking shovel on the rear floorboard. When the Defendant left his brother's house, he left the shovel leaning against the house.

That night, Richard Rimmer saw news reports on the victim's disappearance. He recalled the condition of the Defendant's car and panicked because he suspected his brother was involved. At the suggestion of their father, Richard Rimmer put a towel on the handle of the shovel the Defendant had left and disposed of it in a nearby dumpster.

Law enforcement investigation never yielded any indication the victim was still alive. Officers conducted at least twenty searches for the victim in the vicinity of the property rented by the Defendant's brother, in Mississippi around Plantation Point, near Arkabutla Lake, and in Arkabutla Lake itself. Her body was never found.

Mary Ann Whitlock also saw news reports about the disappearance of the victim, and she saw the same composite sketches Mr. Goforth was shown. She recognized the

_____

[9] Several weeks earlier, the Defendant told his brother that the victim bought the Honda for him but did not want her husband to know. At that time, the Defendant enlisted his brother to help him "pick up" the car from the home of a Collision Center coworker who was supposedly storing it for the Defendant. They pulled up to the coworker's home with no lights on and took the car without going to the house, purportedly so they would not "disturb" the coworker's wife.

men as Billy Wayne Voyles and Raymond Cecil; Ms. Whitlock knew both because they were all from the same small town. She identified Mr. Voyles as the suspect in the baseball cap. She reported this information to law enforcement.

In early March, Michael Adams was working as a road deputy on traffic patrol in Johnson County, Indiana. He stopped the Defendant for speeding. The Defendant was driving a maroon Honda with a license plate that matched the plate on the maroon Honda owned by Mr. Featherston. When he ran the plate numbers, the deputy realized the MPD had an interest in the vehicle as part of an ongoing investigation. He contacted the Johnson County Sheriff's Office, and an officer and an evidence technician went to the scene. The Defendant was taken into custody.

The Johnson County Sheriff's Office contacted the MPD, and MPD detectives flew into Indiana that night. In the meantime, the Johnson County evidence technician followed a wrecker towing the Honda to the intake bay at the sheriff's office and secured the vehicle inside the bay.

The next morning, MPD detectives watched as the Johnson County evidence technician processed the maroon Honda. The technician found reddish-brown stains in the back seat of the vehicle. A presumptive blood test confirmed the substance on the back seat was blood.

The evidence technician took ninety-six photographs of the vehicle and its contents. The photographs included images of: the interior left driver's side door; the right front floorboard; the interior trunk lid; the contents of the trunk; the rear compartment of the back seat; blood stains on the fabric upholstery in the back seat; a hole in the fabric upholstery in the back seat cut to obtain a sample for use in the presumptive blood test; a second hole in the fabric upholstery toward the bottom of the back seat, also cut for the presumptive blood test; and a baggie and envelope containing the presumptive blood test.

The evidence technician also removed and inventoried the contents of the maroon Honda. Each item removed was either sealed and stored in envelopes and paper bags or placed in the trunk of the vehicle, which was sealed prior to transport to Memphis. The individually secured items included: a white towel with red stains; three additional white towels; various receipts from Mississippi, Florida, Missouri, Montana, Wyoming, California, Arizona, and Texas dated February 8 through March 3, 1997; water; Holiday Inn stationery and other miscellaneous papers; maps; duct tape with hair attached; a plastic spray bottle; a glass jar; a pillow with blood spatter; a black baseball cap; a pair of Spalding tennis shoes; faded blue jeans; and a steel hammer. All of these items were released to the MPD detectives prior to their return to Memphis. The Johnson County Sheriff's Office also released the items on the Defendant's person at the time of his arrest, including a men's

watch.

Once the search of the maroon Honda was completed, the vehicle was resealed. Arrangements were made to transport the vehicle to Memphis. It was loaded onto a tow truck, covered with a tarp, and driven to Memphis, where an MPD officer met the wrecker and securely stored the vehicle in the MPD's crime scene tunnel until it could be transported to the Tennessee Bureau of Investigation ("TBI") lab in Nashville.

The MPD detectives flew back to Memphis. They carried the individually sealed items taken from the vehicle onto the plane and stored the evidence in the cockpit for the duration of the flight. The evidence was then stored in the evidence room of the MPD homicide office until it was transmitted to the TBI for DNA analysis.

A few days later, the MPD's case coordinator asked the TBI to run a DNA comparison of the blood samples collected from the hotel to those obtained from the vehicle. The maroon Honda was also sent to the TBI lab in Nashville for processing. An MPD detective supervised the transport of the vehicle by wrecker from Memphis to the TBI lab in Nashville. At the same time, he transported the evidence previously taken from the vehicle to the TBI for testing. When he arrived, the detective signed over the vehicle and the box of evidence to the TBI experts. He asked them to vacuum the vehicle and collect hair and fiber samples to be sent to the FBI. In addition to the maroon Honda, the evidence deposited with the TBI included the following items collected from the vehicle and the Defendant's person after the stop in Indiana: a blood-soaked patch of upholstery cut from the back seat of the vehicle; a swab of blood from the back seat of the vehicle; a pair of K-Swiss tennis shoes; a pair of faded blue jeans; a steel hammer; a pillow with blood spatter; a white towel with blood spatter; a white towel with stains; a roll of duct tape with hair on it; a plastic spray bottle with clear liquid contents; a glass jar; and a men's watch with stains.

After the Honda arrived at the TBI, agents processed it for microanalysis. In doing so, an agent took photographs, inventoried the contents of the vehicle, vacuumed the vehicle to collect any hair or fiber, and took samples of the seats and carpets. At that point, the agent did not analyze any hair or fibers because she did not have anything to compare to them. Instead, she preserved the evidence collected so a comparison could be done later if needed.

Another TBI agent tested the items in the two sealed boxes received from the MPD for the presence of blood. The towels from the crime scene and a pillow in the maroon Honda both tested positive for the presence of human blood. The test for blood was negative as to the hammer, another towel in the vehicle, and the watch.

The TBI agent also conducted a serological analysis on the maroon Honda. She inspected the vehicle for blood stains, took photographs of the stains, tested the stains for the presence of blood, and then cut samples or swabbed the areas so she could conduct a human blood confirmation test. The agent also made four sketches of the interior of the vehicle to document her findings. The buckle on the back-seat passenger-side seatbelt tested positive for the presence of human blood. The inside of the rear driver-side door had stains that tested positive for the possible presence of blood, but the agent did not remember conducting a follow-up test to determine whether it was human blood. The center back seatbelt buckle tested positive for the possible presence of blood, but the agent did not conduct a follow-up test to determine whether it was human blood. The back seat of the vehicle had blood stains, so the agent cut a large square of upholstery from the center of the back seat; it tested positive for the presence of human blood. The agent memorialized her findings in a report.

Once the analysis was complete, MPD released the maroon Honda to Mr. Featherston because the police department did not have the storage capacity to keep it longer. Mr. Featherston viewed it at the impound lot and saw that the liner inside the trunk was missing, the floor mats were missing, and there were stains in the back of the car. The items found in the car when the Defendant was pulled over in Indiana did not belong to Mr. Featherston. When the vehicle was in his possession, Mr. Featherston said, it was clean and did not have stains on the upholstery.

From the evidence taken from the maroon Honda and collected at the crime scene, an FBI forensic examiner determined the DNA of the blood at the crime scene matched the blood found inside the vehicle. The forensic examiner also compared the DNA from the blood collected at the scene and from the vehicle to the DNA of the victim's mother, Marjorie Floyd. The examiner determined the blood was consistent with belonging to a daughter of Ms. Floyd. The DNA type from the blood on the towel collected from the scene matched the DNA type extracted from the victim's pap smear sample. To obtain DNA samples from the victim, investigators collected the victim's toothbrush, sweatpants, and makeup sponge from her home. The DNA extracted from these items was consistent with the DNA from the blood at the motel and inside the maroon Honda.

After his arrest for the murder of the victim, the Defendant participated in at least three escape attempts. The Defendant was initially incarcerated in Franklin, Indiana. While there, he shared a cell with James Douglas Allard, Jr. and told Mr. Allard about his various plans to escape the jail. By the time the Defendant approached Mr. Allard about escape plans, the Defendant had taken concrete steps toward attempting escape by cutting clips along the bottom of the fence in the prison recreation yard with large nail clippers so the fence could be lifted away from the ground. The Defendant also talked with Mr. Allard about escaping through a window, escaping through the block wall inside the cell, killing

a guard, or taking a guard hostage and walking out the front door of the jail.[10]  According to Mr. Allard, the Defendant kept "shanks," homemade knives made of flattened bucket handles, in his cell.  Authorities later found shanks hidden in the Defendant's cell.

Initially, Mr. Allard did not want to hear anything about the Defendant's plans for escape.  Over the course of several weeks, in an apparent attempt to gain Mr. Allard's confidence, the Defendant talked to him a number of times about how he had murdered the victim.  The Defendant told Mr. Allard he murdered his "wife" at the motel where she was employed.  At one point, he told Mr. Allard he shot the victim twice; then he said he beat her in a back room in the motel behind the service desk.  The Defendant described the back room as "pretty bloody" after the beating.  The Defendant told Mr. Allard he took the motel's security camera tape, erased it, put the victim's body in his car, and buried her in a wooded area close to a lake or pond.  Later, when the Defendant received a letter informing him of the MPD's search for the body, he told Mr. Allard he could not believe the body had not been located.

During his conversations about the victim's murder, Mr. Allard said, the Defendant's countenance changed.  He became a "different person" from his everyday demeanor.  His eyes got "real shiny," he started sweating a lot, and he frequently went to the sink to wash his hands.

On October 23, 1997, while awaiting his first trial for murdering the victim, the Defendant made a second attempt to escape incarceration.  The Defendant was one of four prisoners being transported in a federal prisoner transport van.  All the prisoners were held in cages inside the van.  When the drivers stopped to eat lunch, they left the keys in the ignition, the engine running, and a loaded shotgun inside the van.  The Defendant managed to get out of his cage.  He released the other inmates and drove off in the van.

Officers with the Bowling Green, Ohio police department spotted the prisoner transport van.  They initiated a traffic stop, but the Defendant did not stop.  A high-speed chase ensued.  For approximately thirteen miles, during rush hour, officers from several jurisdictions pursued the Defendant, driving at speeds that sometimes reached ninety miles an hour.  Eventually, a road block forced the Defendant to stop.  Officers ordered the driver out of the van over a loudspeaker.  After a couple of minutes, the Defendant exited the van and was taken into custody.

---

[10] While incarcerated in the Johnson County Jail, the Defendant reported subpar jail conditions to the American Civil Liberties Union of Indianapolis, Indiana, and eventually filed a related civil rights lawsuit.  At the trial in this case, the Defendant argued his attempt to escape the Johnson County Jail was related to poor jail conditions.

The third escape attempt occurred on October 16, 1998, while the Defendant was housed in the Shelby County Jail. The Defendant and another inmate used hard objects to break the concrete around a second story window; they then removed the window and dropped a handmade rope out the opening. When they realized a jail employee had spotted them, the Defendant returned to his cell and pretended to be asleep. His cohort inmate dove out the window opening.[11]

At trial, the State called Jerry Findley as an expert in blood stain pattern analysis. To prepare his opinion, Mr. Findley reviewed the crime scene photographs taken on February 8, 1997 by MPD officers. Based on the patterns of blood observed in the photographs, Mr. Findley opined the victim sustained either five blows with blunt force or four blows with a sharp object. Mr. Findley saw no evidence in the photographs that the blood stains resulted from a gunshot; instead, he believed they arose from repeated hits with a toilet lid, fist, or hammer. The photographs documented a large amount of blood, consistent with blows to the head, face, and nose. He acknowledged that, without a body to examine, he could not know the true placement and extent of the victim's injuries.

The Defendant called two expert witnesses at trial. The first was Marilyn Miller, Ph.D., an expert in crime scene investigation and reconstruction, forensic science and serology, and blood spatter pattern analysis. Dr. Miller criticized the quality of the photographs taken of the blood at the scene, including the lack of scale and the angle at which they were taken. She said it was difficult to conduct an adequate blood spatter analysis based on the images in the photographs. From those images, Dr. Miller said, she could only opine that blood was shed and could not determine whether a death had occurred. As a further complication, the blood was diluted with water in a possible attempt to clean; this made it impossible for her to ascertain the quantity of blood present at the scene. Dr. Miller agreed with Mr. Findley that there was no evidence the blood stains were caused by a gunshot. Dr. Miller also agreed with Mr. Findley that the blood stains on the walls of the bathroom could have resulted from either blunt or sharp force. Any object, like a fist, the flashlight found in the bathroom, or the lid to the toilet, could have caused blunt force injuries to the victim. Dr. Miller maintained there was no way to know whether all of the blood came from the same source because not all of it was tested.

Dr. Miller also criticized the lack of security at the crime scene. There were sixteen people present at the scene, she pointed out, which could have resulted in contamination. Further, she said the MPD should have processed more of the high-touch areas, such as the

---

[11] Around the same time, a local attorney, Robert Hutton, filed a lawsuit alleging unconstitutional conditions in the Shelby County Jail due to gang violence. For purposes of injunctive relief, Shelby County admitted the level of violence in the jail violated the Eighth Amendment. At the trial in this case, the Defendant presented evidence of the lawsuit and the County's subsequent admission in support of his contention that this escape attempt was related to jail conditions.

cabinet, the purse, and the entrance and exit, for fingerprints. Lastly, Dr. Miller contended the MPD should have used amino black or luminal[12] to identify the presence of otherwise hidden bodily fluids.

In addition, Dr. Miller found fault with the processing of the maroon Honda. She testified she was never given the opportunity to see an unobstructed photograph of the back seat of the vehicle taken while the bloodstains were fresh. She explained it would have been helpful to her analysis to see the stains in their entirety. Looking at the hole in the back seat where investigators cut the three-inch sample from the upholstery, Dr. Miller pointed out that the blood did not soak into the foam under the upholstery. She said this indicated weight was not placed on the bloodstain.

According to Dr. Miller, the MPD did not adequately test the trunk of the maroon Honda for the presence of blood before it released the vehicle. The liner inside the lid of the trunk had been removed, so it could not be examined. Dr. Miller also maintained that all of the items in the car's trunk should have been tested for blood, not just the few items selected for processing. Also, given the amount of blood at the scene and the apparent attempt to clean it, she thought there would have been blood in the front seat of the vehicle, but there were no positive presumptive tests for any blood on the surfaces she tested in the front area.

Next, the Defendant called an expert in DNA analysis and serology, William Joseph Watson, Ph.D. Dr. Watson had no issue with the results of the tests performed in this case but felt more testing could have been done. Dr. Watson acknowledged that when the original case was worked, it was unusual to have certain types of DNA testing done on things like hair. Nevertheless, he pointed out, the TBI collected hair and fiber evidence but did not test it. Even though no hair samples from the victim were available, a comparison test with family members could have been performed. Dr. Watson also noted it would have been helpful to determine the type of body hair found in the vehicle, but this was not done.

Dr. Watson opined the presumptive and confirmatory blood tests conducted by the TBI did not actually confirm the presence of blood. He explained that the serologist conducted a presumptive blood test followed by a test for human protein. Human protein can be present from saliva or other bodily fluids, not just blood, said Dr. Watson, so the positive result for each test did not necessarily mean the substance was human blood. He said current tests can determine the presence of blood with more certainty.

---

[12] The reference in the transcript to "amino black and luminal" was likely intended to refer to Amido black and Luminol.

- 14 -

Dr. Watson commented on the DNA tests showing that the blood inside the maroon Honda could not be excluded as having come from a female offspring of the victim's mother, Ms. Floyd. Dr. Watson agreed with this conclusion but did not agree that the DNA from the blood in the car "matched" Ms. Floyd's DNA. He explained the term "match" was not used in this context; it could at best be only a partial match because offspring receive DNA from both the mother and father.

Regarding the DNA test performed on the victim's pap smear, Dr. Watson observed that the forensic examiner was limited by the technology available at that time. By the time of Dr. Watson's testimony, there were tests that could use less DNA and obtain a better answer. Regardless, he said, when the forensic examiner found two sources of DNA in the pap smear, he should not have assumed the second DNA source came from a minor contributor such as the victim's husband. Dr. Watson testified that lab conditions in the 1990s were often more lax, and he opined that the additional DNA could have instead come from contamination such as the examiner's ungloved hand. Instead of assuming the minor contributor was the victim's husband, Dr. Watson said, the examiner should have tested the husband's DNA as well.

Finally, Dr. Watson noted that the State tested items collected from the car for the presence of blood twice; because of the intervening appeals and remands, the two tests were eighteen years apart. The first time, the tests resulted in positive findings. The results were negative when the tests were performed again eighteen years later. Dr. Watson opined that the forensic examiner should have looked into the reason for the differing results, and he commented that the manner in which the evidence was stored could have been a factor.

After considering all of the evidence, the jury convicted the Defendant of first degree premeditated murder, first degree felony murder, and aggravated robbery. The trial court merged the first degree premeditated murder and first degree felony murder convictions.

The trial then went into the penalty phase. Against the advice of counsel, the Defendant waived his right to present mitigating evidence. The Defendant testified that he understood he had the right to put on mitigating evidence, knew a mitigation investigation had been done on his behalf, understood the importance of defending against a death sentence, but nevertheless freely and voluntarily waived his right to present mitigating evidence. The Defendant asked his family and friends not to attend the penalty phase of the trial. He directed defense counsel to refrain from giving an opening statement, giving a closing statement, or cross-examining witnesses. The trial court noted the Defendant's decisions were not in his best interest but accepted the Defendant's waiver.

The State first presented victim impact evidence. Previous victim impact testimony

from the victim's mother was read to the jury. She testified about the grief she and the victim's children had endured. Their collective grief was compounded, she said, by having to mourn the victim's death without ever having found her body.

The proof then moved to the aggravating circumstances. The first aggravating circumstance the State asked the jury to consider was that "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person," as set forth in Tennessee Code Annotated section 39-13-204(i)(2). In support, the State introduced evidence of the Defendant's violent criminal history and relied on his prior convictions of assault with intent to commit robbery with a deadly weapon in violation of Tennessee Code Annotated section 39-2-104[13] (case number 85-00448); aggravated assault in violation of Tennessee Code Annotated section 39-2-101[14] (case number 85-00449); another aggravated assault in violation of Tennessee Code Annotated section 39-2-101 (case number 89-02737); and rape in violation of Tennessee Code Annotated section 39-2-604[15] (case number 89-02738). In addition, the State asked the jury to consider two other aggravating circumstances: the murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest of the defendant or another, under Tennessee Code Annotated section 39-13-204(i)(6); and the murder was knowingly committed, solicited, directed, or aided by the defendant while he had a substantial role in committing or attempting to commit robbery, under Tennessee Code Annotated section 39-13-204(i)(7).

The jury found one statutory aggravating circumstance beyond a reasonable doubt, namely, previous convictions for felonies of which the statutory elements involved the use of violence. The jury found beyond a reasonable doubt that this aggravating circumstance outweighed any mitigating circumstances. It imposed a sentence of death.

After a separate sentencing hearing on the aggravated robbery conviction, the trial court imposed an additional eighteen years of confinement running consecutively to the death sentence. The Defendant later filed motions for judgment of acquittal and for a new trial. The trial court denied both motions.

---

[13] This statute was repealed in 1989. *See generally* Act of June 12, 1989, ch. 591, § 1, 1989 Tenn. Pub. Acts 1169. Currently, assault offenses are found at Tennessee Code Annotated sections 39-13-101 to -116.

[14] *See supra* note 13.

[15] This statute was repealed in 1989. *See generally* Act of June 12, 1989 § 1. Rape is currently found at Tennessee Code Annotated section 39-13-503.

The Defendant then filed a direct appeal to the Court of Criminal Appeals, which affirmed the judgment of the trial court. *See State v. Rimmer*, No. W2017-00504-CCA-R3-DD, 2019 WL 2208471 (Tenn. Crim. App. May 21, 2019). This appeal followed.

**ANALYSIS**

**I. Double Jeopardy**

Initially, we consider separate double jeopardy arguments raised by the Defendant and by amicus Amnesty International, Nashville ("Amnesty International"). We address the Defendant's double jeopardy argument first.

*A. Standard of Review*

Questions of constitutional interpretation are reviewed de novo, with no presumption of correctness afforded to the conclusions of the trial court. *State v. Feaster*, 466 S.W.3d 80, 83 (Tenn. 2015).

*B. Defendant's Motion to Dismiss*

The Defendant asserts the trial court erred by denying his motion to dismiss the felony murder charge on double jeopardy grounds because the jury verdict in the first trial operated as an implied acquittal of the felony murder charge. The State counters that double jeopardy did not attach because the trial court instructed the jury not to consider felony murder if it found the Defendant guilty of first degree premeditated murder. We agree with the State.

The United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, the Tennessee Constitution states that "no person shall, for the same offence, be twice put in jeopardy of life or limb." Tenn. Const. art. 1, § 10. The federal and state prohibitions against double jeopardy have been construed as providing the same protections; these include: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989); *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

Often, when a jury considers a multi-count charge and returns a guilty verdict on one count but does not return a verdict on the remaining counts, the jury's silence on the

remaining counts serves as an implied acquittal on them. Double jeopardy prevents retrial on the remaining counts. *State v. Burns*, 979 S.W.2d 276, 290–91 (Tenn. 1998).

This is not the case, however, when a jury has received sequential or "acquittal first" jury instructions, in which the jury is told to consider the lesser counts only if it first finds the defendant not guilty of the greater offense. *See id.* at 291 (citing *State v. Arnold*, 637 S.W.2d 891, 895 (Tenn. Crim. App. 1982)). When a jury returns a guilty verdict on a greater offense after it has received such an instruction, it does not get a full opportunity to consider and return a verdict on the lesser counts. Under those circumstances, if the conviction on the greater offense is later overturned due to a procedural technicality, double jeopardy does not bar retrial on the lesser-included offenses. *See State v. Madkins*, 989 S.W.2d 697, 699 (Tenn. 1999) (noting that after sequential jury instructions, a "verdict of guilty as to attempted felony murder necessarily means that the jury did not consider the charge of attempted second degree murder," so on remand, prosecution could proceed on that charge); *State v. Vann*, No. E2009-01721-CCA-R9-CD, 2011 WL 856967, at *8 (Tenn. Crim. App. Mar. 11, 2011) (noting that with acquittal-first jury instructions, the jury would not have deliberated as to the lesser included offenses after it convicted the defendant of the charged offense).

In this case, at the Defendant's first trial in 1998, the trial court instructed the jury as follows:

> When you retire to consider your verdict in indictment number 98-01034, you will first inquire, is the defendant guilty of Murder in the First Degree as charged in the First Count of the indictment? If you find the defendant guilty of this offense, beyond a reasonable doubt, your verdict should be,

> "We, the Jury, find the defendant guilty of Murder in the First Degree as charged in the First Count of the indictment."

> If you find the defendant not guilty of this offense, or if you have a reasonable doubt of his guilt of this offense, you will acquit him thereof and then proceed to inquire whether or not he is guilty of Murder in the First Degree During the Perpetration of a Robbery as charged in the Second Count of the indictment. [16]

---

[16] Since the Defendant's 1998 trial, the practice as to sequential jury instructions on counts of first degree premediated murder and felony murder has changed. Now, when a defendant faces charges of both first degree premeditated murder and felony murder, trial courts have been advised to instruct the jury to return a verdict on both charges. If the jury returns a guilty verdict on both, the convictions are merged, as they are alternative methods of committing the same offense—first degree murder. *See State v. Cribbs,*

Thus, the Defendant's first jury was given sequential or "acquittal first" jury instructions. The jury convicted the Defendant of first degree murder, aggravated robbery, and theft of property. Having returned a guilty verdict on the first degree murder count, the jury in the first trial did not consider the felony murder count.

In advance of the second trial, the Defendant filed a motion to dismiss the felony murder charge on double jeopardy grounds. In support, the Defendant argued the jury's failure to return a verdict on the felony murder count in the first trial amounted to an acquittal, which prevented a second trial on that charge. The trial court denied the motion. It noted that the trial court in the first trial gave a sequential jury instruction in which it instructed the jury to first render a verdict on the first degree murder charge (Count 1), and then on the felony murder charge (Count 2) or a lesser included offense. On this basis, the trial court in the second trial concluded that the double jeopardy protections of the United States Constitution and Tennessee Constitution did not apply. The Defendant raised this issue again in his motion for a new trial, and the trial court denied it for the same reason.

On direct appeal, the Court of Criminal Appeals considered the same issue. It reached the same conclusion as the trial court:

> The jury at the Defendant's first trial was instructed to consider the felony murder charge only if it returned a not guilty verdict for premediated murder. A jury is presumed to follow the trial court's instructions. We conclude that in this case the lack of a jury verdict on the felony murder count at the first trial was not an implicit acquittal and that double jeopardy principles were not violated at the second trial. The Defendant is not entitled to relief on this basis.

*Rimmer*, 2019 WL 2208471, at *9 (citation omitted).

We agree with the lower courts. Based on the sequential jury instructions given in the 1998 trial and the subsequent verdict, once the jury found the defendant guilty of first degree premeditated murder (Count 1), we presume it stopped its deliberations without considering the felony murder charge (Count 2). Thus, the jury in the first trial did not have a full opportunity to consider the felony murder count before it rendered its verdict, so double jeopardy did not prevent the State from prosecuting the Defendant for felony murder in the second trial. *See, e.g.*, *Price v. Georgia*, 398 U.S. 323, 329 (1970) (holding double jeopardy prevents retrial on the greater charge when the first jury "was given a full opportunity to return a verdict" on the greater charge and returned a verdict on the lesser

---

967 S.W.2d 773, 788–89 (Tenn. 1998).

charge instead (quoting *Green v. United States*, 355 U.S. 184, 191 (1957))).  Accordingly, we affirm the trial court's denial of the Defendant's motion to dismiss the felony murder count.

### C. Amnesty International Double Jeopardy Argument

Amicus Amnesty International argues the Double Jeopardy Clauses of the United States Constitution and the Tennessee Constitution barred the Defendant's second trial because of alleged prosecutorial misconduct in the first trial and sentencings.  The State argues, and we agree, that the Defendant waived this double jeopardy argument by failing to raise it in his motion for new trial and on appeal.  *See State v. Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018) ("To preserve the double jeopardy issue, [the defendant] had to raise it in his motion for new trial and appellate brief.").  Nevertheless, because this is a capital case, we conduct a plain error review of this issue.  *See State v. Odom*, 336 S.W.3d 541, 555 n.9 (Tenn. 2011) (applying a plain error standard of review but noting the issue could also be reviewed pursuant to Tennessee Code Annotated section 39-13-206(b)'s mandate that a court reviewing a capital case "shall first consider *any errors assigned* and then . . . shall review the sentence of death" and the outcome would be the same).[17]

In order for an appellate court to conclude that plain error has occurred, all of the following factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been violated; (4) the accused must not have waived the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice.  *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016).  Here, the retrial of the Defendant did not violate a clear and unequivocal rule of law.

Double jeopardy does not preclude "the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction."  *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988); *see also State v. Harris*, 919 S.W.2d 323, 328 (Tenn. 1996) ("[N]o constitutional provision prevents retrial after a reversal for legal error.").  Moreover, despite Amnesty International's arguments to the contrary, prosecutorial misconduct prevents retrial only when, through the misconduct, the prosecutor intended to force the defendant into moving for a mistrial and succeeded in doing so.  *State v. Tucker*, 728 S.W.2d 27, 31 (Tenn. Crim. App. 1986).  The alleged prosecutorial misconduct in this case did not involve forcing the Defendant into moving for a mistrial.[18]

---

[17] The outcome of our review would be the same under Tennessee Code Annotated section 39-13-206(b).

[18] The Defendant alleged that the prosecutor in the first trial committed misconduct by: withholding

- 20 -

The proper remedy for any alleged prosecutorial misconduct in this case was a new trial, which the Defendant requested and received.[19]  *See, e.g.*, *State v. Honeycutt*, 54 S.W.3d 762, 769 (Tenn. 2001) (new trial for ineffective assistance of counsel); *State v. Goltz*, 111 S.W.3d 1, 10 (Tenn. Crim. App. 2003) (new trial for prosecutorial misconduct that did not involve forcing the defendant into a mistrial).  The Defendant is not entitled to relief on grounds of double jeopardy.

## II. Motion to Suppress DNA Evidence

Next, the Defendant asserts the trial court erred by denying his request to dismiss the indictments or suppress DNA evidence collected from the maroon Honda because evidence was destroyed when the MPD released the vehicle before the defense had an opportunity to inspect it.  In response, the State equates the vehicle to a crime scene and argues the MPD did not have a duty to retain the vehicle for years, particularly when it properly collected and preserved the evidence contained inside the car before releasing it.  Again, we agree with the State.

### A. Standard of Review

To review a trial court's decision regarding the fundamental fairness of a trial conducted despite missing or destroyed evidence, we apply a de novo standard.  *State v. Merriman*, 410 S.W.3d 779, 791 (Tenn. 2013).  If we conclude the trial would be fundamentally unfair without the missing or destroyed evidence, then we review the remedy imposed by the trial court for an abuse of discretion.  *Id.* at 791–92.

### B. *Ferguson* Analysis

The Due Process Clause in the United States Constitution and its counterpart in the Tennessee Constitution both give every criminal defendant the right to a fair trial.  U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.  "To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment."  *State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999) (citing *Brady v. Maryland,* 373 U.S. 83, 87 (1963)).  This right imposes a duty on the State to produce all evidence that raises reasonable doubt as to the guilt of the defendant.  *Id.* (citing *United States v. Agurs,* 427 U.S. 97, 110–11 (1976)).

---

exculpatory evidence; destroying exculpatory evidence; filing motions that contained misrepresentations; knowingly directing a witness to provide false testimony; and failing to inform the Defendant about a possible conflict of interest.  As noted above, the post-conviction court rejected these claims.

[19] Again, the post-conviction court granted the Defendant relief based on ineffective assistance of counsel, not the alleged prosecutorial misconduct.

In *Ferguson*, the Court considered the course of action to take when allegedly exculpatory evidence is lost or destroyed before it is produced to the defense. *See id.* *Ferguson* held that, as an element of due process, fundamental fairness requires review of the entire record to ascertain the effect of the destroyed or missing evidence. *Id.* at 914. It adopted a balancing test for determining whether the defendant can have a trial that is fundamentally fair in the absence of that evidence. *Id.* at 917.

Under the *Ferguson* balancing test, the reviewing court first considers whether the State had a duty to preserve the missing evidence. *Id.* Subject to Rule 16 of the Tennessee Rules of Criminal Procedure and other applicable laws, including *Brady*, the State has a duty to preserve potentially exculpatory evidence that cannot be obtained by other reasonably available means. *Id.*; *Merriman*, 410 S.W.3d at 792. The *Ferguson* Court explained:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

2 S.W.3d at 917 (quoting *California v. Trombetta*, 467 U.S. 479, 488–89 (1984)).

If the reviewing court concludes the State had a duty to preserve the evidence in question and failed to do so, then it must determine whether destruction of the evidence violated the defendant's due process rights. This determination is made by balancing the following factors: (1) the degree of negligence involved in the destruction or loss of the evidence; (2) the significance of the destroyed evidence, considered in light of its probative value and the reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction. *Id.*; *Merriman*, 410 S.W.3d at 785.[20] If the reviewing court decides a trial without the evidence would be fundamentally unfair, the remedies may include dismissal of the charges or a jury

---

[20] In *Merriman*, we noted that a *Ferguson* analysis may be conducted pre-trial. We cautioned, however, that evidence to be presented at trial is reviewed only to put the missing evidence into context and allow the court to craft the appropriate remedy, if necessary. It is not reviewed for the purpose of determining the defendant's guilt or innocence beyond a reasonable doubt. The trial court retains discretion to reserve its ruling on a *Ferguson* motion until the evidence has been presented at trial. *Merriman*, 410 S.W.3d at 789–90. In the instant case, because this was the Defendant's second trial, the trial court was able to view evidence that had substantially been presented to jurors in the previous trial and reviewed by appellate courts.

instruction explaining how the jury is to consider the lost or destroyed evidence. *Ferguson*, 2 S.W.3d at 917.

*Ferguson* was applied by our Court of Criminal Appeals in *State v. Hollingsworth*, in which the intermediate appellate court considered a trial court's denial of a motion to dismiss an indictment. No. E2015-01463-CCA-R3-CD, 2017 WL 111331, at *14 (Tenn. Crim. App. Jan. 11, 2017), *perm. app. denied*, (Tenn. May 24, 2017). In that case, the victim's car was collected as evidence after her death in 1997. The car was processed by police and then released to the victim's family. *Id.* The defendant was not charged with the victim's murder until 2014, long after the vehicle was released. *Id.* The defendant moved for dismissal of the indictment for murder on grounds that the release of the vehicle deprived him of the right to a fair trial. The trial court denied the motion. *Id.*

On appeal, the intermediate appellate court in *Hollingsworth* first observed that the vehicle was not lost or destroyed; the State released it to the victim's family after processing pursuant to police department policy. *See id.* (explaining that *Ferguson* does not impose a duty on the police to collect evidence in a particular manner). Moreover, samples taken from the vehicle as part of the investigation were preserved as evidence and available to the defendant for analysis. *Id.* The appellate court held that the State did not have a duty to retain and preserve the vehicle itself, particularly over the many years of trial, retrials, and resentencing. *Id.* at *15.

In the alternative, the *Hollingsworth* court reasoned that, even if the State had a duty to preserve the vehicle, its absence did not deprive the defendant of a fundamentally fair trial. *Id.* The vehicle was released pursuant to an established policy, not through negligence or bad faith. Given police department storage limitations, the department was not required to hold the vehicle from 1997 until 2014. *Id.* Moreover, the amount of evidence taken from the vehicle and preserved was significant. It included photographs of the vehicle's interior and exterior; photographs and measurements of tire tracks found in the defendant's backyard; samples taken from the vehicle that were tested by the TBI and the results of those tests; and samples of foliage taken from the vehicle and the defendant's backyard. In light of all of this evidence, the vehicle itself would not have been particularly significant. *Id.* Finally, the evidence presented at trial was sufficient to convict the defendant of second degree murder, so "[e]ven if third party DNA was found inside the victim's car, it would not have explained the other substantial evidence of the [d]efendant's guilt." *Id.* In those circumstances, the Court of Criminal Appeals concluded, the defendant's trial was fundamentally fair, so the trial court did not err in denying the defendant's motion to dismiss the indictment. *Id.*

In the case at bar, the Defendant moved to dismiss the indictments or suppress DNA evidence collected from the maroon Honda because the vehicle was released before the

Defendant had the opportunity to inspect and independently test it. According to the Defendant, the fact that no blood from the victim was found in the car's trunk, even after a witness testified he saw someone at the Memphis Inn place a large object in the trunk, would have been exculpatory. Depriving him of the ability to inspect and independently test the vehicle, the Defendant argued, deprived him of the right to a fundamentally fair trial.

In its denial of the motion, the trial court held that the State did not have a duty to retain the vehicle. Under *Ferguson*, the trial court could have stopped there, but it went further. The trial court also found that, apart from the cuttings and other items collected from the Honda, the vehicle itself constituted material evidence because it "potentially" had "exculpatory value" and comparable evidence could not be obtained by other means. However, in balancing the three *Ferguson* factors, the trial court concluded the Defendant could receive a fundamentally fair trial in the absence of the Honda. It found the first factor weighed in the Defendant's favor because the release of the vehicle was intentional. However, the trial court found in favor of the State as to the other two factors: the significance of the lost or destroyed evidence in contrast to the secondary or substitute evidence and the sufficiency of the remaining evidence. The trial court noted that the evidence from the interior of the car connected the Defendant to the victim's murder and that any exculpatory value potentially gleaned by testing the trunk was speculative. It found that the evidence without the vehicle was sufficient for conviction. Under *Ferguson*, then, the trial court held that the release of the maroon Honda did not violate the Defendant's due process rights, so it denied the motion.

The Court of Criminal Appeals likewise concluded that the State did not have a duty to preserve the vehicle. Consequently, it found no error in the trial court's denial of the Defendant's motion to dismiss the indictments or suppress the DNA evidence collected from the maroon Honda. *Rimmer*, 2019 WL 2208471, at *11. The Defendant argued further that the trial court erred in declining to give a *Ferguson* jury instruction concerning the State's release of the vehicle. The Court of Criminal Appeals rejected this argument as well on the basis that the State had no duty to preserve the vehicle. *Id.*

After review of the record, we agree with the lower courts that the State did not have a duty to preserve the maroon Honda for later production to the Defendant. The efforts to retrieve evidence from the vehicle before its release were thorough and extensive. After the Defendant was pulled over in Indiana, Johnson County Sheriff's Office employees searched the vehicle and inventoried evidence in the presence of MPD officers. A positive presumptive blood test was conducted and preserved as to at least one of the reddish-brown stains in the vehicle's back seat. Investigators took ninety-six photographs of the vehicle and its contents, including photographs of the trunk after the inside cover was removed. The vehicle and items taken from it were then securely transported for processing, first to

Memphis and later to the TBI. Once at the TBI, the maroon Honda was photographed, inventoried, and vacuumed for hair and fiber samples. Upholstery and carpet samples were cut for fiber analysis, and items taken from the vehicle were tested for the presence of human blood. Investigators conducted serological analysis of the interior of the vehicle to confirm the presence of human blood in the back seat.

The items taken from the vehicle, the bloody patches of upholstery cut from the back seat of the vehicle, and the abundant photographs of the vehicle were all preserved and available to the Defendant for analysis. Under these circumstances, the vehicle itself had little apparent exculpatory value, and its release back to the owner did not leave the Defendant unable to obtain comparable evidence through the investigatory materials that remained available to the defense. *See Ferguson*, 2 S.W.3d at 917. The State had no duty to retain the vehicle.

In the alternative, even if the State had a duty to preserve the vehicle, the release of the maroon Honda back to the owner did not violate the Defendant's due process rights. First, there was no negligence involved in the State's failure to retain the vehicle. *Id*. As in *Hollingsworth*, the Honda in this case was released pursuant to policy because law enforcement authorities did not have the storage capacity to retain it indefinitely. 2017 WL 111331, at *14.

Second, the vehicle itself had little significance as evidence; the Defendant offers only speculation as to the probative value of being able to physically inspect the trunk. Per the DNA tests, the blood at the crime scene matched the blood found inside the Honda, and both were consistent with being the blood of the victim. The existence of blood of a third party or the absence of any blood whatsoever in the trunk would not negate this evidence.

Finally, the other evidence used at trial was overwhelming. *See Ferguson*, 2 S.W.3d at 917. As summarized above, while incarcerated for rape of the victim, the Defendant expressed a desire to kill her. A witness described seeing someone who fit the Defendant's description at the Memphis Inn with blood on his hands the night the victim disappeared. Another witness recalled seeing a maroon Honda parked close to the night entrance of the Memphis Inn around 1:40 a.m. and saw a man fitting the Defendant's description place something heavy and wrapped in a blanket into the vehicle's trunk. DNA tests determined blood found at the scene and inside the Honda was consistent with that of the victim. Immediately after the victim disappeared, the Defendant went to see his brother to get assistance cleaning blood from the Honda's interior, stopped going to work, and embarked on a cross-country trip, leaving behind his last paycheck. The Defendant later confessed to the murder in conversations with a fellow inmate, complete with accurate descriptions of the crime scene. Finally, the Defendant tried to escape custody on multiple occasions.

Consequently, even if the State had a duty to preserve the Honda, which it did not, the release of the vehicle did not result in a fundamentally unfair trial. Accordingly, we affirm the trial court's denial of the Defendant's motion to dismiss the indictments or suppress DNA evidence.

### III. Rule 404(b) Evidence

The Defendant next asserts the trial court erred under Tennessee Rule of Evidence 404(b) in admitting evidence of his prior convictions and escape attempts because the danger of unfair prejudice outweighed the probative value of the evidence. As a result, the Defendant contends, the jury was permitted to convict him based on his bad character rather than the circumstantial evidence presented at trial.

In response, the State argues the prior crimes against the victim were relevant to establish the Defendant's motive and intent, and the prior escape attempts indicated the Defendant's consciousness of guilt. It maintains that the related jury instructions minimized the prejudicial impact of the evidence. We agree with the State.

#### A. *Standard of Review*

The parties agree that, before it admitted the evidence at issue, the trial court substantially complied with the procedural safeguards in Rule 404(b), so we review its decision for an abuse of discretion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Trial judges abuse their discretion when they cause injustice to the complaining party by applying an incorrect legal standard, reaching an illogical conclusion, or basing a decision on an erroneous assessment of the evidence. *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). In applying the abuse of discretion standard, appellate courts should not substitute their judgment for that of the trial court. *Id.* Rather, appellate courts should determine whether the evidence supports the factual basis for the trial court's decision, whether the trial court properly applied the pertinent law, and whether the trial court's decision was within the range of acceptable alternatives. *Id.*

#### B. *Tennessee Rule of Evidence 404(b)*

Rule 404(b) of the Tennessee Rules of Evidence provides that evidence of other crimes, wrongs, or acts is not admissible to show conformity with the character trait at issue but may be admissible for other purposes, such as motive, intent, or identity. *See State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). Rule 404(b) seeks to prevent convictions based on mere propensity evidence. To that end, before a trial court may admit evidence of other crimes, wrongs, or acts, Rule 404(b) requires it to utilize the following

procedural safeguards:

> (1)     The court upon request must hold a hearing outside the jury's presence;
>
> (2)     The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3)     The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4)     The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)–(4); *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002).

In the context of Rule 404(b), this Court has defined "unfair prejudice" as an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *DuBose*, 953 S.W.2d at 654 (quoting *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978)). Rule 404(b) analysis of material evidence requires trial courts to balance probative value against the danger of unfair prejudice; the more probative the evidence, the lower the chance of unfair prejudice becomes. *State v. Mallard*, 40 S.W.3d 473, 488 (Tenn. 2001).

### C.     Convictions for Rape and Assault

In this case, the Defendant filed a motion to suppress evidence admitted in his first trial relating to his convictions for rape and aggravated assault. Pursuant to Rule 404(b), the State then filed notice of its intent to introduce certain evidence at the retrial, including: (1) evidence of the Defendant's January 1989 assault and rape of the victim, the Defendant's guilty plea, and the sentence imposed by the trial court; and (2) evidence of the Defendant's attempts to escape jail after his arrest for first degree murder and burglary.[21]

---

[21] The State also sought to introduce evidence the Defendant engaged in other domestic abuse of the victim. As to this evidence, the trial court held the State failed to meet the clear and convincing standard of Rule 404(b), so it denied the request. This ruling was not challenged on appeal. The State also sought to introduce evidence that the maroon Honda the Defendant was driving when he was arrested in Indiana had been reported stolen. At the Rule 404(b) hearing, the parties agreed to draft a stipulation explaining the defendant was pulled over and detained in Indiana for a reason unrelated to the disappearance of the

Prior to trial, the trial court held a Rule 404(b) hearing at which it heard testimony from two witnesses—the victim's daughter, Tracye Ellsworth Brown, and the MPD officer who responded to the victim's call for help during the attack, Clifford Freeman. Ms. Brown was six years old at the time of the attack in January 1989. She was at home when the Defendant assaulted and raped her mother, and she testified about her recollection of the events. Officer Freeman testified about the victim's state when he arrived at the scene, statements the victim made about the attack, and the subsequent apprehension of the Defendant.

The trial court held that the Defendant's guilty plea, conviction, and incarceration for the 1989 rape and assault of the victim were admissible under Rule 404(b). It found the State had proven the rape and assault by clear and convincing evidence. The trial court noted that the evidence included proof of the relationship between the Defendant and the victim as well as proof of the Defendant's malice and hostility toward the victim. This evidence was probative of identity, motive, intent, and premeditation, all non-propensity reasons for its admission. The trial court then held that the danger of unfair prejudice to the Defendant did not outweigh the probative value of the evidence.

Likewise, after reviewing the initial trial testimony of Mr. Lescure and Mr. Conaley, the trial court found their statements about the Defendant's intent to harm the victim after his release from prison were probative of intent, motive, identity, and premeditation. It held that the danger of unfair prejudice to the Defendant did not outweigh the probative value of the statements. The trial court ruled the testimony of Mr. Lescure and Mr. Conaley would be admissible under Rule 404(b) so long as it was consistent with the evidence presented at the first trial.

Nevertheless, the trial court excluded proffered evidence of the details of the Defendant's attack on the victim. It decided that evidence of those details presented a strong risk of inflaming the passions of the jury and a danger of unfair prejudice to the Defendant. The trial court also excluded the testimony of Ms. Brown as to the underlying events because she was a young child at the time of the rape and her recollection was hazy; the trial court held it did not meet the clear and convincing standard.

The Court of Criminal Appeals affirmed the trial court's admission of evidence relating to the rape and assault of the victim. It concluded the trial court had properly found the evidence was probative of issues other than the Defendant's bad character or propensity to commit murder and had carefully balanced the probative value of the evidence against the danger of unfair prejudice. *Rimmer*, 2019 WL 2208471, at *15.

---

victim, so the trial court dismissed this portion of the State's motion as moot.

As noted, the Defendant does not contend the trial court failed to follow the procedural requisites of Rule 404(b). Instead, he maintains the trial court erred in holding that the probative value of this evidence outweighed the danger of unfair prejudice. *See* Tenn. R. Evid. 404(b)(4).

This Court has previously held that prior instances of domestic abuse by a defendant against a victim can be admissible under Rule 404(b). *See, e.g.*, *State v. Jarman*, 604 S.W.3d 24, 51 (Tenn. 2020) (affirming admissibility of evidence of defendant's prior alleged assault of victim to show defendant's intent and state of mind); *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993) (in capital murder case, affirming admissibility of evidence of defendant's prior assaults of two of the victims, his estranged wife and her son, to show defendant's hostility, malice, intent, and settled purpose to harm them). *But see State v. Gilley*, 173 S.W.3d 1, 7 (Tenn. 2005) (noting "there is no *per se* rule of admissibility under Rule 404(b) for prior acts of abuse committed by a defendant against a victim").

In this case, the evidence at issue includes: Ms. Brown's reference to the Defendant's rape and assault of her mother and her mother's visits with the Defendant in jail afterwards; Richard Rimmer's statement that his brother pled guilty to raping the victim; judgment forms documenting the Defendant's guilty pleas to aggravated assault and rape; Mr. Conaley's testimony about anger the Defendant expressed toward the victim; Mr. Conaley's testimony regarding the Defendant's threat to kill the victim if she did not share unrelated personal injury settlement money with him; Mr. Conaley's observations about the Defendant's demeanor when he talked about the victim; Mr. Lescure's testimony about the Defendant's threat to "kill the funky bitch" after his release from prison; and Mr. Lescure's observations about the Defendant's demeanor when he talked about the victim.

Clearly the evidence at issue has probative value and also presents potential for unfair prejudice. The trial court found explicitly that the evidence was probative of identity, motive, intent, and premeditation and held that its probative value outweighed the danger of unfair prejudice to the Defendant. The trial court also acted to mitigate the risk of unfair prejudice by excluding evidence of the details of the 1989 rape and assault. The trial court then took a further step by giving the following limiting instruction to the jury:

> If from the proof you find that the defendant has been convicted of Rape or Aggravated Assault, you may not consider such evidence to prove his disposition to commit such a crime as that on trial. The evidence may only be considered by you for the limited purpose of determining whether it proves motive; that is, such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offenses for which he is presently on trial.
> . . . .

Such evidence of other crimes, if considered by you for any purpose, must not be considered for any purpose other than those specifically stated in this instruction.

We presume the jury followed these instructions. *See State v. McKinney*, 74 S.W.3d 291, 310 (Tenn. 2002) (presuming the jury followed the trial court's limiting instructions regarding the consideration of victim impact evidence).

Considering the entire record, we must conclude the trial court did not abuse its discretion. We affirm its decision to admit evidence of the Defendant's prior convictions for rape and aggravated assault, including the statements made to Mr. Conaley and Mr. Lescure during his subsequent incarceration for those offenses.

## C. *Escape Attempts*

The State also sought to introduce evidence of the Defendant's escape attempts in Indiana, Ohio, and Tennessee for the purpose of showing consciousness of guilt. The Defendant moved to exclude this evidence under Rule 404(b) as well.

The trial court reviewed the prior trial testimony of James Allard, Richard Skaggs, Tony Lomax, and Dennis Tillman about the Defendant's escape attempts. After performing the balancing required under Rule 404(b), it ruled their testimony would be admissible in the second trial. The trial court noted that defense counsel had ample opportunity to cross-examine these witnesses at the first trial, and it held that the evidence was clear and convincing. It determined that the evidence was relevant to establish consciousness of guilt. In light of the dissimilarity of the crime of escape and the crime of murder, it found that a jury would be unlikely to use the evidence of escape as propensity evidence. To diminish the potential for unfair prejudice, the trial court indicated it would give a limiting instruction to the jury and ultimately did so.

The Court of Criminal Appeals reviewed the testimony at issue, as well as evidence of homemade "shanks" found in the Defendant's cell in Indiana which served to corroborate the evidence of his plans to escape. *Rimmer*, 2019 WL 2208471, at *15. It held the trial court did not abuse its discretion in admitting evidence regarding the Defendant's escape attempts. *Id.*

It is well established that evidence of escape or attempted escape after the commission of a crime can be relevant and admissible at trial to show guilt, knowledge of guilt, and consciousness of guilt. *State v. Burton*, 751 S.W.2d 440, 450 (Tenn. Crim. App. 1988); *see also Craig v. State*, 455 S.W.2d 190, 193 (Tenn. Crim. App. 1970) (citing 22A C.J.S. *Criminal Law* § 631) (affirming admission of testimony about defendant's escape

from custody when brought to the courthouse for a preliminary hearing as evidence of guilt, knowledge of guilt, or consciousness of guilt); *State v. Taylor*, 661 S.W.2d 695, 698 (Tenn. Crim. App. 1983) ("It is universally recognized that testimony as to flight, attempted flight or concealment after the commission of an offense or after one is accused of a crime is relevant evidence which may be shown as a criminating circumstance . . . ."). The stage of the proceedings in which the escape attempt occurs is of no consequence; it is admissible regardless of the time that passed since the defendant's arrest. *Burton*, 751 S.W.2d at 450.

The evidence at issue concerned the Defendant's flight in a prisoner transport van, his attempted escape in Indiana, homemade shanks found in his cell,[22] and his attempted escape in Tennessee. After reviewing the record, we agree with the Court of Criminal Appeals that the trial court properly analyzed this evidence under Rule 404(b). We note as well that the trial court mitigated any potential for unfair prejudice by giving the jury two limiting instructions. The first:

> If from the proof you find that the defendant has committed any escape or plan or attempt to commit an escape, you also may not consider any such evidence to prove his disposition to commit such a crime as that on trial. This evidence may only be considered by you for the limited purpose of determining whether it tends to prove flight. The fact of flight alone does not allow you to find that the defendant is guilty of the crimes for which the defendant is now on trial, but if flight is proven, you may consider the fact of flight with all of the other evidence when you decide the guilt or innocence of the defendant. The rules for this consideration are set out in the following instruction on flight.
>
> Such evidence of other crimes, if considered by you for any purpose, must not be considered for any purpose other than those specifically stated in this instruction.

And the second:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that a Defendant fled is a question for your determination.

---

[22] The Defendant also argues the evidence regarding the shanks was admitted in violation of the Fifth Amendment of the United States Constitution and Tennessee Rules of Evidence 401, 402, and 403. The Defendant references no caselaw and makes only a skeletal argument. This argument is without merit.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that a defendant is guilty of the crime alleged. However, since flight by a Defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of a defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by a Defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

Again, we presume the jury followed these instructions. *McKinney*, 74 S.W.3d at 310.

Under all of these circumstances, we conclude the trial court's decision to admit evidence of the Defendant's escape attempts was not an abuse of its discretion.

## IV. Mandatory Review of Death Sentence

This Court is statutorily required to review the Defendant's death sentence. *See* Tenn. Code Ann. § 39-13-206(a)(1) (2018). Our review must include whether (1) the death sentence was imposed in an arbitrary fashion; (2) the evidence supports the jury's findings of statutory aggravating circumstances; (3) the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances; and (4) the capital sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. *Id.* § 39-13-206(c)(1)(A)–(D).

### A. Arbitrariness in Imposition of Death Penalty

In his supplemental brief to this Court, the Defendant does not seek modification of his sentence. Rather, he asks the Court to vacate his convictions and order another new trial. In his supplemental brief, the Defendant also raises, for the first time, a general arbitrariness challenge to his death sentence, presumably because this Court ordered the parties to brief the issue for oral argument. Regardless of the Defendant's failure to raise this issue before now, we are statutorily required to consider whether his death sentence

was imposed in an arbitrary manner.  *Id.* § 39-13-206(c)(1)(A).

After considering the arguments made by the Defendant and analyzing all pertinent law, we conclude the jury in this case did not render an arbitrary verdict of death.  Our review reveals that the trial court conducted both the guilt and penalty phases of trial in accordance with the applicable statutes and procedural rules.  The evidence was more than sufficient to support the guilty verdict.  The jury sentenced the Defendant to death after it found beyond a reasonable doubt one aggravating circumstance—one or more convictions for a felony with statutory elements involving violence to a person—and also found beyond a reasonable doubt that this aggravating circumstance outweighed any mitigating circumstances.  The State presented certified copies of four judgments of conviction for prior violent felonies committed by the Defendant, and the Defendant waived his right to present mitigating evidence.  The imposition of the death penalty was not arbitrary.[23]

## B.     *Aggravating Circumstance*

Before imposing the death penalty or life imprisonment, juries must unanimously find the existence of at least one aggravating circumstance beyond a reasonable doubt.  *See* Tenn. Code Ann. § 39-13-204(i) (2018 & Supp. 2020).

In this case, the jury found beyond a reasonable doubt one aggravating circumstance: "The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person."  *Id.* § 39-13-204(i)(2).  In this context, "violence" is defined as "physical force unlawfully exercised so as to injure, damage, or abuse."  *State v. Jones*, 568 S.W.3d 101, 139 (Tenn. 2019) (quoting *State v. Fitz*, 19 S.W.3d 213, 217 (Tenn. 2000)).  If the elements of the felonies on which the State relies in support of aggravated circumstance (i)(2) can

---

[23] The Defendant claims his death sentence was arbitrary because the decision to seek the death penalty is left to the whim of a prosecutor and is often a product of outside pressures, like the media.  Both the United States Supreme Court and this Court have concluded that the discretion afforded to prosecutors in deciding whether to seek the death penalty does not render the penalty arbitrary or capricious.  *Gregg v. Georgia*, 428 U.S. 153, 199 (1976); *State v. Brimmer*, 876 S.W.2d 75, 86 (Tenn. 1994).  The Defendant further contends it was arbitrary because the guilty verdict in this case was based on circumstantial evidence.  This argument is counter to well-established Tennessee precedent.  "[T]he cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence." *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).  Finally, the Defendant asserts the death penalty should not be an option in a trial with errors.  We have held repeatedly that defendants, even in capital cases, are not entitled to a perfect trial.  *See, e.g.*, *State v. Hutchison*, 482 S.W.3d 893, 921 (Tenn. 2016) ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." (alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986))); *State v. Hawkins*, 519 S.W.3d 1, 38 (Tenn. 2017) (affirming a death sentence despite harmless error in admitting the defendant's statement); *State v. Willis*, 496 S.W.3d 653, 730 (Tenn. 2016) (affirming a death sentence despite harmless error in double-counting a single felony-murder aggravating circumstance).  We respectfully reject these arguments.

- 33 -

be satisfied without proof of violence, then the trial court must examine the facts underlying the convictions before it allows the State to present evidence of use of violence. *State v. Sims*, 45 S.W.3d 1, 12 (Tenn. 2001).

Here, to support its contention that the Defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence, the State relied on the Defendant's convictions of assault with intent to commit robbery with a deadly weapon (case number 85-00448); aggravated assault (case number 85-00449); aggravated assault (case number 89-02737); and rape (case number 89-02738). Aggravated assault can be proven without evidence of violence. *See id.* at 10–11 (noting the trial court properly found that aggravated assault "does not necessarily involve the use of violence to another person" in that the offense "may be committed by intentionally or knowingly causing the victim to reasonably fear imminent bodily injury by use or display of a deadly weapon" (footnote omitted)). The trial court below was already familiar with the facts underlying the Defendant's 1989 aggravated assault conviction from reviewing the lengthy pretrial testimony related to it. It also reviewed the indictment for the Defendant's 1985 conviction for aggravated assault, which stated the Defendant "[d]id unlawfully, knowingly, willfully cause, or attempt to cause serious bodily injury." Based on this, the trial court held the underlying facts involved the use of violence. Only then did the trial court allow the State to present evidence of the aggravated assault conviction to the jury.

During the guilt phase of the trial, the State submitted evidence of the Defendant's 1989 aggravated assault and rape convictions, including certified copies of those judgments. In the penalty phase of the trial, the State entered into evidence certified copies of judgments reflecting the Defendant's 1985 guilty pleas to assault with intent to commit robbery with a deadly weapon and aggravated assault. The State argued all four convictions should be considered in support of the aggravating circumstance. The jury unanimously agreed.

The Defendant does not challenge the underlying felony convictions presented by the State, nor does he dispute that they involve an element of violence.

The record in this case shows the trial court followed the proper procedures in admitting the evidence relating to the Defendant's violent felony convictions. The record contains certified judgments for all four convictions. We hold that the evidence fully supports the jury's finding that the State proved aggravating circumstance (i)(2) beyond a reasonable doubt.

C.     *Aggravating Circumstances Outweigh Mitigating Circumstances*

Tennessee law also requires us to assess whether "[t]he evidence supports the jury's

finding that the aggravating . . . circumstances outweigh any mitigating circumstances." Tenn. Code Ann. § 39-13-206(c)(1)(C). The Defendant waived his right to present mitigating evidence during the penalty phase of the trial, and the trial court found his waiver was knowing and voluntary. Despite the waiver, the trial court instructed the jury that it could consider any mitigating evidence presented during the course of trial. After considering all of the evidence, in returning a verdict of death, the jury found beyond a reasonable doubt that the aggravating circumstance outweighed any mitigating circumstances.

From our review, the record contains little if any mitigating evidence to weigh against the aggravating circumstance. We hold that the evidence fully supports the jury's finding that the aggravating circumstance in this case outweighed any mitigating circumstances.

### D. Proportionality Review

Finally, Tennessee law requires the Court to determine whether the sentence of death in this case is excessive or disproportionate to the penalty imposed in similar cases. *Id.* § 39-13-206(c)(1)(D). In doing so, we consider whether the death sentence in this case is aberrant, arbitrary, or capricious in that it is "disproportionate to the punishment imposed on others convicted of the same crime." *State v. Bland*, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting *Pulley v. Harris*, 465 U.S. 37, 43 (1984)).

To perform this review, we employ a precedent-seeking method of comparative proportionality review, in which we compare this case with other cases involving similar crimes and similar defendants. The pool of cases to be compared consists of "first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death," without regard to the sentence that was imposed. *State v. Rice*, 184 S.W.3d 646, 679 (Tenn. 2006) (citing *State v. Godsey*, 60 S.W.3d 759, 783 (Tenn. 2001); *Bland*, 958 S.W.2d at 666).

The death sentence for the Defendant must be deemed disproportionate if this case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Bland*, 958 S.W.2d at 668. Thus, in our proportionality review, we examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved." *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002). Specifically, we consider:

> (1) the means of death; (2) the manner of death; (3) the motivation for the
> killing; (4) the place of death; (5) the victim's age, physical condition, and

psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*State v. Reid*, 164 S.W.3d 286, 316 (Tenn. 2005) (citing *Bland*, 958 S.W.2d at 667). We also consider several factors about the Defendant, including his (1) record of prior criminal activity; (2) age, race, and gender; (3) mental, emotional, and physical conditions; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Id.* at 316–17.

Here, the evidence indicates that the means of death was a violent and bloody attack involving blunt or sharp force. The manner of death could not be confirmed because authorities were never able to locate the victim's body.

As to the motivation for the killing, the evidence shows that the Defendant and the victim had a tumultuous off-and-on romantic relationship that included the Defendant's assault and rape of the victim and his 1989 guilty plea to the same. The evidence shows that, while he was incarcerated for these offenses, the Defendant repeatedly blamed the victim for his incarceration, expressed anger toward her, and told fellow inmates he planned to kill the victim upon his release.

The evidence indicates the place of death was the victim's place of employment. The Defendant went there the night of February 7, 1997 while the victim worked the overnight shift as a motel night clerk in a high crime area to support her family. The motel lobby office where the victim worked was secure; the door remained locked at night and the victim interacted with customers through a clear shield with a drawer. Despite the Defendant's past brutalization of the victim, she maintained a relationship with him. The Defendant took advantage of the victim's trust; when the Defendant came to the motel with at least one other male, the victim let them in. The evidence indicated the victim was killed in a bloody, violent encounter there at the motel, and her body was placed in the maroon Honda.

At the time of her death, the victim was forty-five years old. As to the victim's physical condition and psychological condition, the evidence indicated she was leading a productive life with a happy marriage and a close relationship with her mother and her teenage daughter. The victim was also close to her son, who depended on the victim for support and care regarding conditions arising out of severe burns he had sustained as a child. At the time of her death, the victim babysat her son's daughter, the victim's granddaughter, multiple times a week.

The evidence of the Defendant's conversations with Mr. Lescure and Mr. Conaley indicates the murder was premeditated. When the Defendant spoke to them about his anger at the victim and his intent to kill her once he got out of prison, the subject matter of the conversation caused him to foam at the mouth and sweat as he spoke. Approximately a year later, the Defendant followed through on his threat.

The record does not contain any evidence of provocation or justification for the murder.

The evidence shows that the effect of the victim's murder on the non-decedent victims—her family—was profound. Her husband, mother, daughter, and son all enjoyed a close and loving relationship with the victim, and they were greatly affected by her absence from their lives. During the penalty phase of the trial, the victim's mother testified that the fact that the victim's body was never found made closure for the family all the more difficult. The family was forced to have a memorial service for the victim without a body. The victim's mother testified about the mental and emotional effect of not knowing exactly how her daughter died and whether she was in pain or fear at the time of her death.

We next consider several factors about the Defendant. A white male who was thirty-one years old at the time of the offenses, the Defendant had a significant record of violent crime, including armed robbery, two counts of aggravated assault, and rape. As to the Defendant's mental, emotional, and physical conditions, the evidence shows he had an emotional and physical reaction when he talked about his anger at the victim and his intent to kill her. Although there was proof at trial that potentially two other males accompanied the Defendant to the Memphis Inn the night the victim disappeared, the testimony of the Defendant's fellow inmates about the Defendant's descriptions of the murder indicates that he played an active role in killing the victim. This is consistent with the proof about the Defendant's past relationship with the victim, the proof of his motive, the evidence of premeditation, and his decision to leave immediately afterward on a cross-country trip, driving a vehicle stained with the victim's blood.

The evidence shows the Defendant did not cooperate with authorities. After the murder, the victim's body was never located. The Defendant's conversations with other inmates indicated he disposed of the body, but instead of directing authorities to the body, the Defendant marveled that they had never found it. Moreover, after the murder, the Defendant attempted to escape from custody on three occasions. His plan to escape custody in Indiana, as described to a fellow inmate, included "grabbing a guard," and homemade shanks were later found in his cell. After he stole a prisoner transport van in Ohio, the Defendant put public lives in danger by engaging in an extended high-speed chase. All told, the evidence indicates the Defendant has no remorse and no potential for rehabilitation.

Based on our thorough review of the record and Supreme Court Rule 12 reports,[24] we conclude that the death sentence imposed in this case is neither excessive nor disproportionate to the penalty imposed in similar cases. We previously affirmed the death sentence rendered following the Defendant's first trial and second sentencing hearing, citing a string of decisions upholding the death penalty where the defendant's violent felony history is the sole aggravating circumstance. *Rimmer*, 250 S.W.3d at 36 (citing *State v. Copeland*, 226 S.W.3d 287, 306–07 (Tenn. 2007); *State v. Cole*, 155 S.W.3d 885, 907–09 (Tenn. 2005); *State v. Dellinger*, 79 S.W.3d 458, 475–77 (Tenn. 2002); *McKinney*, 74 S.W.3d at 314; *State v. Chalmers*, 28 S.W.3d 913, 920 (Tenn. 2000); *State v. Keough*,[25] 18 S.W.3d 175, 184 (Tenn. 2000)).

There are other cases in which this Court has affirmed the death sentence based on the sole aggravating circumstance of the defendant's violent felony history. *See, e.g.*, *State v. Thomas*, 158 S.W.3d 361, 382 (Tenn. 2005); *State v. Smith*, 993 S.W.2d 6, 21 (Tenn. 1999); *State v. Adkins*, 725 S.W.2d 660, 662 (Tenn. 1987).

In this Court's review of Mr. Rimmer's first capital conviction, we also cited prior cases in which the jury imposed the death penalty after a conviction for the murder of a current or estranged significant other. *Rimmer*, 250 S.W.3d at 36 (citing *State v. Stephenson*, 195 S.W.3d 574, 596 (Tenn. 2006), *abrogated on other grounds by Watkins*, 362 S.W.3d 530; *State v. Ivy*, 188 S.W.3d 132, 157 (Tenn. 2006); *State v. Faulkner*, 154 S.W.3d 48, 63 (Tenn. 2005); *Stevens*, 78 S.W.3d at 822–23; *State v. Suttles*, 30 S.W.3d 252, 255 (Tenn. 2000); *State v. Hall,* 8 S.W.3d 593, 595–96 (Tenn. 1999); *State v. Porterfield*, 746 S.W.2d 441, 443–44 (Tenn. 1988)).

There are additional cases in which this Court has affirmed the death penalty for murder involving estranged lovers and other domestic disputes. *See, e.g.*, *State v. Clayton*, 535 S.W.3d 829, 836–37 (Tenn. 2017) (defendant lethally shot his girlfriend and her parents); *Smith*, 868 S.W.2d at 583 (defendant murdered his estranged wife and her two sons from a prior marriage); *State v. Johnson*, 743 S.W.2d 154, 155–56 (Tenn. 1987) (defendant suffocated his wife with a plastic bag); *State v. Cooper*, 718 S.W.2d 256, 256 (Tenn. 1986) (defendant shot his estranged wife four times at her place of employment).

This Court has also affirmed the death penalty in cases where the circumstances of the murder involved severe beating. *See, e.g.*, *State v. Nichols*, 877 S.W.2d 722, 725 (Tenn. 1994) (victim, discovered in a pool of blood, died two days after the defendant repeatedly

---

[24] Tennessee Supreme Court Rule 12 requires trial courts to file extensive reports in all cases in which the defendant is convicted of first degree murder. These reports include data about the crime, the defendant, and the punishment imposed. *See* Tenn. Sup. Ct. R. 12(1) & app.

[25] *Keough* involved a defendant who murdered his estranged ex-wife.

hit her in the head with a piece of lumber while he raped her); *State v. Barber*, 753 S.W.2d 659, 660 (Tenn. 1988) (defendant murdered the victim by beating her multiple times in the head during a burglary); *State v. McNish*, 727 S.W.2d 490, 491 (Tenn. 1987) (victim died after being severely beaten with a vase).

Combining these two circumstances, as in the instant case, at least three death penalty cases have involved the brutal beating of a significant other. *See, e.g.*, *Faulkner*, 154 S.W.3d at 62–63 (defendant killed his wife by hitting her in the head and face with a skillet and a metal horseshoe; the sole aggravating circumstance was subsection (i)(2)); *Hall*, 8 S.W.3d at 597 (victim, the estranged ex-wife of the defendant, sustained at least eighty-three separate wounds, including several blows to head, before she drowned in a pool); *Porterfield*, 746 S.W.2d at 444–45 (defendant, hired by the victim's wife to murder her husband, killed him by beating him in the head with a tire iron twenty-one times).

No two cases are identical, and we need not find an identical comparative case. *Ivy*, 188 S.W.3d at 158. We need only analyze similar first degree murder cases in which the State sought the death penalty, there was a capital sentencing hearing, and the sentencing jury decided whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death, "regardless of the sentence actually imposed," to determine whether the punishment here is disproportionate to the punishment of others convicted of the same crime. *Godsey*, 60 S.W.3d at 783; *Bland*, 958 S.W.2d at 662. It is not.

Based on our review of the record in this case and our review of other cases in which the death penalty was sought, we hold that the sentence of death imposed in this case is not disproportionate to the penalty imposed for similar crimes under similar circumstances. The Defendant is not entitled to relief on this basis.

## CONCLUSION

For the reasons set forth above, we hold: (1) in light of sequential jury instructions given in the first trial, double jeopardy principles did not bar retrial on the felony murder count; (2) alleged prosecutorial misconduct in the first trial did not trigger double jeopardy protections; (3) the State did not have a duty to preserve the maroon Honda, so the trial court did not err in denying the Defendant's motion to suppress DNA evidence from the vehicle; (4) under Tennessee Rule of Evidence 404(b), the trial court did not err in admitting evidence of the Defendant's prior convictions for rape and aggravated assault and his subsequent sentence, including the statements made to Mr. Conaley and Mr. Lescure; (5) the trial court did not err under Rule 404(b) in admitting evidence of the Defendant's escape attempts, including the corroborating evidence of homemade shanks found in his cell; (6) imposition of the death penalty is neither arbitrary nor

disproportionate given the circumstances of the crime; (7) the evidence supports the jury's finding that the State proved beyond a reasonable doubt aggravating circumstance (i)(2) under Tennessee Code Annotated section 39-13-204; (8) the evidence supports the jury's finding beyond a reasonable doubt that the aggravating circumstance outweighed any mitigating circumstances; and (9) the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. We agree with the conclusions of the Court of Criminal Appeals as to the remaining issues and have included the relevant portions of its opinion in the attached appendix. We affirm the convictions and the sentence.

The sentence of death shall be carried out as provided on the 10th day of May, 2022, unless otherwise ordered by this Court or other proper authority. It appearing that the Defendant, Michael Rimmer, is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
HOLLY KIRBY, JUSTICE

# APPENDIX

# (EXCERPTS FROM THE DECISION OF THE COURT OF CRIMINAL APPEALS)

## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 5, 2018 Session

### STATE OF TENNESSEE v. MICHAEL RIMMER

**Appeal from the Criminal Court for Shelby County**
**No. 98-01033, 98-01034     Chris Craft, Judge**

_____

### No. W2017-00504-CCA-R3-DD

_____

## [Introduction omitted]

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Paul Bruno, Nashville, Tennessee; and Robert Parris, Memphis, Tennessee, for the appellant, Michael Rimmer

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Andrew C. Coulam, Senior Counsel; Rachel M. Stephens and Pamela S. Anderson, District Attorneys General Pro Tem, for the appellee, State of Tennessee.

## OPINION

### PROCEDURAL BACKGROUND

[Omitted]

### ANALYSIS

## I. Sufficiency of the Evidence and Indictments

The Defendant contends that no evidence connected him to the crimes, but his argument focuses on whether the indictments provided him with adequate notice that other persons could have been involved in the crimes. The Defendant argues that the evidence showed that two other men committed the murder and that no evidence supports a theory of criminal responsibility. The State responds that ample evidence connected the Defendant to the murder and to the robbery and that "the fact that others might have been involved was not an element of the charged offenses." Further, the State argues that criminal responsibility is a theory of guilt and need not be stated in an indictment.

## A. Sufficiency of the Evidence

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-81.

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (2014).

Aggravated robbery is defined, in relevant part, as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," "where the victim suffers serious bodily injury." *Id.* §§ 39-13-401(a) (2014), -402(a)(1). Theft of property occurs when "with the intent to deprive the owner of property, [a] person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a) (2014).

There was strong direct and circumstantial evidence establishing that the Defendant participated in the victim's murder and the aggravated robbery of the victim. The Defendant discussed his plan to kill the victim and to hide her body when he was previously incarcerated for assaulting the victim. Witnesses testified that a maroon car was seen at the motel, and the Defendant was seen with a maroon Honda the day after the victim's disappearance. The Defendant was driving the maroon Honda at the time of his arrest, and the car contained blood and DNA consistent with that of the victim. The motel bathroom contained the victim's blood and DNA, and the victim was never seen after the early morning hours of February 8, 1997. Testimony established that $600 and several sets of bed sheets were missing from the motel office. Some of the missing money was from a lockbox kept in a back room, and the victim kept the key to the box on her person. The Defendant told another inmate that he had been in the back room "doing something" after he shot the victim in the chest, that she "got up," and he shot her in the head. One of the witnesses saw a man place an object rolled up in a blanket in the trunk of a maroon car that was backed into a parking place with its open trunk facing toward the building. The car sank when the object was placed in the trunk.

Witnesses and investigators described a bloody scene indicative of a violent struggle, supporting the conclusion that the victim suffered serious bodily injury. Witness testimony also established that two perpetrators participated in the offenses. Mr. Allard testified that the Defendant confessed to being present at the motel and to actively participating in the attack against the victim. Several hours after the victim disappeared, the Defendant arrived at his brother's home Mississippi in a maroon Honda, which was muddy. The Defendant's shoes were muddy, and he asked his brother to dispose of a shovel and to assist him in cleaning blood from the backseat of the car.

Following the victim's disappearance, the Defendant also disappeared for approximately one month. He stopped going to work and did not pick up his last paycheck, although his supervisor described the Defendant as reliable. Receipts found in the Honda showed that the Defendant had traveled throughout the country before his arrest in Indiana. After his arrest, he told Mr. Allard that he had murdered the victim and hid her body. The Defendant also attempted to escape from police custody on three occasions. We conclude that sufficient evidence supports the first degree premeditated murder, first degree felony murder, and aggravated robbery convictions.

## B. Sufficiency of the Indictments

An individual accused of a crime has the right to be informed of the nature and cause of an accusation against him. U.S. Const. amend. XI, XIV; Tenn. Const. art. 1, § 9. Pursuant to Tennessee Code Annotated section 40-13-202 (2012), an indictment

> must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment . . . .

Our supreme court has said that an indictment is sufficient if it provides adequate information to enable the defendant to know the accusation against which he must defend, furnishes the trial court with an adequate basis for entry of a proper judgment, and protects the defendant from double jeopardy. *See State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *see also Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000). The supreme court has held that "indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). In this regard, "specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." *State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000). The indictment "need not allege

the specific theory or means by which the State intends to prove each element of an offense to achieve the overriding purpose of notice to the accused." *Hammonds*, 30 S.W.3d at 300. Thus, the State is not required to assert a theory of criminal responsibility in the charging instrument. *State v. Lemacks*, 996 S.W.2d 166, 172-73 (Tenn. 1999).

The indictments were not included in the appellate record, but they were read into evidence at the trial. The aggravated robbery indictment in No. 98-01033 read as follows:

> Count 1, The grand jurors of the State of Tennessee . . . present that [the Defendant], during the period of time between February 7th 1997, and February 8th, 1997, in Shelby County, Tennessee, and before the finding of this indictment, intentionally or knowingly did take from [the victim] a sum of money of value by violence or putting [the victim] in fear. And the victim . . . suffered serious bodily injury, in violation of Tennessee Code Annotated 39-13-402 . . . .

The murder indictment in No. 98-01034 stated:

> Count 1, The grand jurors of the [S]tate of Tennessee . . . present that [the Defendant] during the period of time between February 7th 1997, and February 8th, 1997, in [C]ounty of Shelby, Tennessee, and before the finding of this indictment did unlawfully, intentionally, and with premeditation kill [the victim] in violation of Tennessee Code Annotated 39-13-202 . . . .

> Count 2[,] The grand jurors of the State of Tennessee . . . present that [the Defendant], during the period of time between February 7th, 1997, and February 8th, 1997, in Shelby County, Tennessee, did unlawfully, with the intent to commit robbery, kill [the victim] during the perpetration of or attempt to perpetrate robbery, in violation of Tennessee Code Annotated 39-13-202 . . . .

The elements of aggravated robbery, premeditated murder, and felony murder were clearly set forth in the indictment, along with the statutes for each. The Defendant contends that the State's rebuttal closing argument included statements that other persons were involved in the crimes and that these assertions "surprised" him. However, the State is not required to set forth its theory of guilt in the indictment. The State's argument was based on the proof submitted at trial, including witness testimony that more than one person was participated in the crimes at the motel on the night the victim disappeared. The Defendant is not entitled to relief on this basis.

## II. Double Jeopardy

[Omitted]

### III. Motion to Suppress DNA Evidence

[Omitted]

### A. Collateral Estoppel

[Omitted]

### B. Due Process Violation

[Omitted]

### IV. State's Opening Statement

The Defendant next asserts that the trial court erred in not striking the State's opening statement or in not declaring a mistrial when the prosecutor said that the car had been "taken." The Defendant argues that the State's reference to the car implied it had been stolen, which violated the court's pretrial order prohibiting the State from referring to the car as stolen, pursuant to Tennessee Rule of Evidence 404(b), and due process. The State disagrees, arguing that reference to the car as "taken" did not violate the court's pretrial ruling, that Rule 404(b) does not apply to opening statements, and that any due process violation was by failing to object at the trial and in the motion for new trial.

In addition to the aggravated robbery and murder charges, the Defendant was indicted for the theft of the Featherstons' maroon Honda. However, the trial court severed the theft charge prior to trial. The court determined that the theft was not part of the same criminal transaction as the murder and aggravated robbery. It also prohibited the State from eliciting evidence that the car had been stolen. However, the court permitted the State to show that the Defendant had control of the car before and after February 7, 1997, in order to establish that he was the perpetrator of the aggravated robbery and murder. It recognized that the Defendant's possession of the car before and after the victim's disappearance was "very material" to his identity as the perpetrator.

In the opening statement, the prosecutor said the following:

[F]rom February 8th through March 5th, [the Memphis Police Department] had been looking for [the Defendant] everywhere they could. They also knew that there was, obviously, some interest in this vehicle, maroon vehicle, and they ended up locating that - - a friend that had worked with [the

Defendant] owned a vehicle matching that description. And learned that that
vehicle had been taken from outside [the Featherstons'] home. And so the
police are going to be on the lookout for this tag number and this vehicle.

At the conclusion of the statement, the Defendant objected to the State's use of the word
"taken," moved to have the statement stricken, and argued that it was grounds for a mistrial.
According to the Defendant, the State's words gave a "clear implication" that he had stolen
the car, violating the court's order. The State argued that its statement did not violate the
court's ruling because the car could have been borrowed or have been missing due to a
misunderstanding.

The trial court determined that the State did not violate its order or necessitate a
mistrial. The court found that the State had a right to show that the Defendant took the car
and that the car was missing but not that any crime was committed when the car was taken.
The court emphasized that the State would not be allowed to elicit testimony about whether
the Defendant had permission to take the car or whether the police were called in response.

Opening statements "are intended merely to inform the trial judge and jury, in a
general way, of the nature of the case and to outline, generally, the facts each party intended
to prove." *State v. Reid*, 164 S.W.3d 286, 343 (Tenn. 2005). Opening statements are not
evidence. *State v. Thompson*, 43 S.W.3d 516, 523 (Tenn. Crim. App. 2000). Trial courts
should allow the parties to present "a summary of the facts supportive of the respective
theories of the case, only so long as those 'facts are deemed likely to be supported by
admissible evidence.'" *State v. Sexton*, 368 S.W.3d 371, 415 (Tenn. 2012)
(quoting *Stanfield v. Neblett*, 339 S.W.3d 22, 41-42 (Tenn. Ct. App. 2010)). Therefore,
opening statements should "be predicated on evidence introduced during the trial" and
should never refer "to facts and circumstances which are not admissible in
evidence." *Sexton*, 368 S.W.3d at 415.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*,
563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no
feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593,
596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of
the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App.
1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will
only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786
S.W.2d 642, 644 (Tenn. 1990).

The Defendant cites to a single authority to support his argument that the use of the
word taken during the opening statement was improper. In *State v. James C. Greene, Jr.*,
the defendant challenged his conviction on the basis that the State referred to inadmissible

hearsay in its opening statement. No. 03C01-9407CR00247, 1995 WL 564939, at *1 (Tenn. Crim. App. Sept. 26, 1995). The trial court prohibited the State from introducing evidence that the police had conducted surveillance on the defendant based on information that he was involved in illegal activity. During the opening statement, the prosecutor said, "[T]he Third Judicial Drug Task Force had information that [the defendant was] dealing drugs." The defendant immediately objected to relevance and requested a mistrial. The court overruled the motion for a mistrial but sustained the objection and advised the jury to disregard the statement and not consider it for any purpose. *Id.* at *3.

On appeal, this court held that the defendant was not harmed by the prosecutor's statement and that a mistrial was not required. *Id.* at *4. The proof adduced at the trial showed that the defendant was an admitted drug abuser but was not a seller. The court concluded that the proof offered at the trial was not affected by the opening statement and that the jury acquitted the defendant of possession with intent to sell or deliver. *Id.*

*James C. Greene, Jr.* is distinguishable from the present case because in *James C. Greene, Jr.*, the prosecutor explicitly defied the trial court's order. However, in the present case, the trial court concluded that the State's comment did not run afoul of the pretrial order and reiterated that the State was allowed to show that the Defendant had possession of the car before and after the victim's disappearance to establish his identity as the perpetrator. The court attempted to balance the State's right to use the evidence to prove the perpetrator's identity and the Defendant's right to fairness by excluding evidence of the theft. We conclude that the court did not abuse its discretion in refusing to strike the opening statement or to grant a mistrial. The Defendant is not entitled to relief on this basis.

The Defendant also contends that the use of the word taken was a Fifth Amendment due process violation. He did not object on this basis at the trial, and the general contention is the extent of his argument on appeal. "In this jurisdiction, a party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection . . . in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 634 (Tenn. Crim. App. 1994). When a party asserts new grounds in the appellate court, the issue is treated as waived. *Id.* at 635. Furthermore, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). The Defendant's failure to object on this basis at the trial or to adequately address the issue in his brief qualifies the issue for waiver. However, we will review this issue for plain error.

Five factors are relevant

when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642. A defendant carries the burden of proving that the trial court committed plain error. *See State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

The Defendant has not shown that the State's use of the word taken amounted to a violation of due process that adversely affected a substantial right. "For a 'substantial right' of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings." *State v. Maddin*, 192 S.W.3d 558, 562 (Tenn. Crim. App. 2005). The State's single use of the word taken in its opening statement comported with the trial court's previous ruling and with the evidence presented at trial. The Defendant is not entitled to relief on this issue.

## V. Evidence of Prior Assault on Victim and Escape Attempts

[Omitted]

## VI. William Baldwin's Testimony

The Defendant asserts that the trial court erred in prohibiting William Baldwin from testifying about a statement made by an MPD detective. The Defendant argues that exclusion of this evidence violated Tennessee Rules of Evidence 401 and 402. He also asserts that the MPD lost a video recording made by Mr. Baldwin, which violated *Brady v. Maryland*, 373 U.S. 83 (1963). The State asserts that the court did not err because the proffered testimony was hearsay from an unknown police officer and was irrelevant. The State further responds that the *Brady* issue has been waived because it was not raised in the motion for new trial.

William Baldwin was an evidence technician for the Johnson County, Indiana Sheriff's Department. Before Mr. Baldwin testified at the trial, the Defendant sought

- 49 -

permission to question Mr. Baldwin outside the presence of the jury regarding a statement he overheard when he processed the car. According to the Defendant, Mr. Baldwin overheard an MPD detective say, "Well, it looks like the n----r did it." The State opposed admission of the statement, arguing that Mr. Baldwin could not identify the person who allegedly made the statement and that it was inadmissible hearsay. The Defendant admitted that there was never an African-American suspect and that the evidence would not be offered to prove that an African-American committed the crime. However, he argued that the evidence was exculpatory. The Defendant surmised that if he could prove Detective Shemwell made the statement, the statement was relevant to Detective Shemwell's credibility. The trial court ruled that the evidence was irrelevant and inadmissible. The court further expressed skepticism that Mr. Baldwin heard what he thought he heard, noting that "Rimmer did it" sounded very similar and made more sense in context.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We conclude that the trial court did not abuse its discretion by determining that the proffered evidence was not relevant. The Defendant admitted there was never an African-American suspect. The Defendant is not entitled to relief on this basis.

The Defendant also argues that the exclusion of this evidence "violated the Fifth Amendment to the United States Constitution." This general contention is the extent of his argument. Although the Defendant raised the issue in his motion for a new trial, he did not contemporaneously object at the trial. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b); Tenn. R. Evid. 103(a), (b). In any event, we will review the issue for plain error.

"An evidentiary ruling ordinarily does not rise to the level of a constitutional violation." *State v. Powers*, 101 S.W. 3d 383, 397 (Tenn. 2003) (citing *Crane v. Kentucky*, 476 U.S. 683, 689 (1986)). To determine whether the exclusion of evidence rises to the level of a constitutional violation, courts consider the following: (1) whether the evidence is critical to the defense, (2) whether it bears sufficient indicia of reliability, and (3) whether the interest supporting exclusion is substantially important. *State v. Brown*, 29 S.W. 3d 427, 433-34 (Tenn. 2000).

The excluded evidence in this case was not critical to the defense because the Defendant conceded that there was never an African-American suspect. A substantial right of the Defendant was not adversely affected. *See Smith*, 24 S.W.3d at 282. The Defendant is not entitled to relief on this issue.

Finally, the Defendant alleges that law enforcement's failure to preserve the videotape and to provide it to the defense violated *Brady*. The Defendant did not raise this issue at the trial or include the issue in his motion for new trial and his appellate argument is limited to one sentence. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Our review is limited to plain error.

Mr. Baldwin testified that he videotaped his inventory of the car and that the recording contained audio. The recording allegedly captured the statement, "[T]he n----r did it." Mr. Baldwin testified that he thought he provided the recording to the MPD but that he was not sure. Mr. Baldwin explained that the recording was not listed on the computer inventory list of all the items turned over to the MPD. He thought that he gave "everything" to the MPD and said that he had no reason to retain the recording. However, he had no record of providing it to MPD.

The defense argued that Mr. Baldwin's testimony supported its theory that the MPD intentionally destroyed the recording because the recording pointed to someone other than the Defendant as a suspect and that the MPD, and Detective Shemwell in particular, had "tunnel vision" in investigating the Defendant.

The trial court found that no evidence supported the Defendant's theory that Detective Shemwell intentionally destroyed the recording. The court noted that the detective had no reason to destroy the recording to cover up the possible identity of an African American suspect because there was no indication that an African-American suspect existed. The court concluded that the "whole thing is just an absolute nonissue." However, the court allowed the defense to ask Mr. Baldwin whether a videotape was made, whether he remembered giving it to MPD, and whether it was available at the time of trial.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

In order to show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

The Defendant has not shown that a clear and unequivocal rule of law was breached because the evidence does not show that the recording was material. A recording of one of the investigating detectives stating "the n----r did it" would not have cast doubt on the Defendant's identity as the perpetrator. Although the recording would have established that a detective engaged in unprofessional conduct, there is no reasonable probability that the jury would have acquitted the Defendant based upon the comment. The Defendant is not entitled to relief on this issue.

## VII. Drawing of the Honda Backseat

The Defendant alleges that the trial court erred when it allowed into evidence a drawing of the backseat of the car. According to the Defendant, the drawing did "not reflect the true condition of the backseat" and was admitted in violation of Tennessee Rule of Evidence 403. The State disagrees, claiming that the court's determination that the drawing would assist the jury was reasonable.

Tennessee Rule of Evidence 403 states that, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The decision to admit evidence will be reversed "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and the admission of the evidence

"caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 249 (Tenn. 1999)).

TBI agent and forensic serologist Samera Zavaro testified that she processed the car for blood evidence. When she located a reddish-brown stain, she conducted a presumptive blood field test. If the surface was fabric and resulted in a positive presumptive test, she took cuttings of the stained area and later conducted tests of the cuttings to determine whether they contained human blood. If the stain was found on a hard surface, she swabbed the surface and performed a second test using the swab. She identified photographs of the car, including the backseat. She testified that because the interior fabric was also a reddish-brown color, it was difficult to discern stains from the photographs alone. However, she said that it was easier to see the stains when personally viewing the evidence. Accordingly, she made several drawings of the car in which she depicted the areas where stains were found, including the backseat.

When the State attempted to introduce the backseat drawing, the Defendant objected on the basis that the drawing was not the best evidence and was not accurate. He claimed that the drawing depicted more blood than the photographs. The trial court overruled the objection, pointing to Agent Zavaro's testimony that the stains were difficult to see in the photographs alone. The court found that the drawing would assist the jury's understanding and admitted the evidence. The court noted that the accuracy of the drawing could be challenged on cross-examination.

Although the Defendant does not elaborate in his brief about how admission of the evidence violated Rule of Evidence 403, his objection at the trial was based on the danger of misleading the jury. The trial court admitted the evidence based upon a finding that the drawing would assist the jury in understanding where in the backseat the blood was located. The Defendant did not ask Agent Zavaro questions challenging the accuracy of the drawing. The court did not abuse its discretion in admitting the evidence, and the Defendant is not entitled to relief on this basis.

The Defendant also asserts that admission of the backseat drawing violated the Fifth Amendment of the United States Constitution. He did not object on this basis at the trial and did not adequately address the issue in his appellate brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). As such, our review is limited to plain error.

An evidentiary ruling rarely rises to the level of a constitutional violation. *See Powers*, 101 S.W.3d at 397. Furthermore, we have already determined that admission of the backset drawing was proper under the Rules of Evidence. We conclude that the Defendant's allegation of constitutional error is without merit, and he has not established that admission was plain error. *See, e.g.*, *State v. Dustin Dwayne Davis*, No.

03C01-9712-CR-00543, 1999 WL 135054, at *5 (Tenn. Crim. App. Mar. 15, 1999); *State v. Allan Brooks*, No. 01C01-9510-CC-00324, 1998 WL 754315, at *11 (Tenn. Crim. App. Oct. 29, 1998). He is not entitled to relief on this issue.

## VIII. Admission of James Allard's Previous Testimony

The Defendant contends that the trial court erred in finding James Allard was unavailable and in allowing the State to present Mr. Allard's testimony through a transcript of the previous trial. He asserts that the State's efforts to locate Mr. Allard were "wholly insufficient" and that the prior testimony should have been excluded. The State responds that its efforts to locate Mr. Allard were reasonable and that the court did not err in declaring Mr. Allard unavailable and in admitting his previous testimony.

TBI Agent Charles Baker testified that he attempted to locate Mr. Allard through law enforcement databases as well as Google searches. He consulted "CLEAR," which searched real estate records, criminal information, and both criminal and civil records. He also searched the State of Tennessee Justice Portal, which contained driver's license information, vehicle information, criminal histories, and Tennessee Department of Correction information. He further searched the National Crime Information Center (NCIC) which he characterized as a national search through the FBI. Finally, he searched death records. He found a potential phone number but, after calling the number, determined it was a "dead end."

On cross-examination, Agent Baker said that he did not attempt to contact Mr. Allard's family because he did not have information about any family members. Agent Baker admitted that he was not aware Mr. Allard had been previously incarcerated in Indiana and said that he did not search for him through the Indiana Department of Correction.

The Defendant argued that the State's efforts were insufficient. He asserted that Mr. Allard had a long criminal history and that if the right methods had been utilized, the State should have been able to identify his family members and gain more information about his whereabouts. The trial court found that the State's efforts were reasonable. The court stated that it did not "know how else [the State] can go about finding a witness, if they don't know who the family members are, other than Google searches and database searches." The court noted that Mr. Allard's imprisonment in Indiana nearly twenty years ago did not mean he was still in the state. The court found that the State was not required to send an investigator to every state in search of a witness.

The Constitution of the United States provides the accused in a criminal prosecution the right "to be confronted with witnesses." U.S. Const. amend. VI. The Tennessee

Constitution similarly provides the right "to meet witnesses face to face." Tenn. Const. art. I, § 9. However, the right of confrontation is not absolute and must occasionally give way to considerations of public policy and necessities of the case. *State v. Kennedy*, 7 S.W.3d 58, 65 (Tenn. Crim. App. 1999) (citing *Jenkins v. State*, 627 N.E.2d 789, 793 (Ind. 1993)). Thus, the United States Supreme Court has refused to apply a literal interpretation of the Confrontation Clause which would bar the use of any hearsay. *Idaho v. Wright*, 497 U.S. 805, 814 (1990).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court announced the test to determine admissibility under the Confrontation Clause of hearsay offered against an accused. Testimonial statements may not be offered into evidence unless two requirements are satisfied: (1) the declarant/witness must be unavailable and (2) the defendant must have had a prior opportunity to cross-examine the declarant/witness. *Id.* at 68. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

Mr. Allard's previous testimony was testimonial; thus, the pertinent consideration is whether the State proved that the witness was unavailable. To accomplish this, "the State must prove that it made a good faith effort to secure the presence of the witness in question." *State v. Sharp*, 327 S.W.3d 704, 712 (Tenn. Crim. App. 2010). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." *Crawford*, 541 U.S. at 74-75. Good faith refers to the extent to which the State must attempt to produce the witness and is a question of reasonableness. *Sharp*, 327 S.W.3d at 712 (citing *Ohio v. Roberts*, 448 U.S. 56, 74 (1980)). The trial court's decision will be affirmed absent an abuse of discretion. *Hicks v. State*, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972).

Our supreme court considered what constitutes a good faith effort in *State v. Armes*, 607 S.W.2d 234 (Tenn. 1980). In *Armes*, the State attempted to subpoena the witness before trial and discovered that the witness had disappeared. *Id.* at 236. This disappearance resulted in a mistrial. *Id.* One week before the second trial and again one day before the second trial, the State attempted to subpoena the witness, but the State was unable to locate the witness. *Id.* At the trial the State attempted to present the witness's preliminary hearing testimony. *Id.* The State failed to provide any independent evidence of an attempt to locate the witness to prove the witness's unavailability other than a statement by the prosecutor. The supreme court held that "[t]he prosecuting attorney's statement to the Court concerning the efforts of the State's investigator to locate the witness cannot be considered as evidence of proof on the issue of the State's good faith effort." *Id.* at 237. Our supreme court also determined that the State was on notice that

extra effort would be required to locate the witness because he did not appear for the first trial date. *Id.*

Unlike *Armes*, the State in the present case produced independent evidence of its efforts to locate Mr. Allard. Nearly twenty years had passed between the first trial and the State's attempts to locate Mr. Allard before the second trial. Agent Baker attempted to locate the witness using numerous search tools, including the NCIC database, which he explained was a national search through the FBI. Agent Baker developed one unsuccessful lead through a telephone number. The agent said he did not have information about Mr. Allard's family members and was unable to contact them to gain more information. This evidence supports the trial court's determination that the State made good-faith, although ultimately unsuccessful, efforts to locate the witness.

Given the passage of time and the independent evidence produced by the State, we conclude that the trial court did not abuse its discretion in determining Mr. Allard was unavailable. The Defendant is not entitled to relief on this issue.

### IX. Rhonda Ball Johnson's Testimony

The Defendant argues that the trial court erred in allowing Rhonda Ball Johnson to testify about conversations she had with William Conaley, alleging that it was inadmissible hearsay. He asserts that her testimony violated Tennessee Rules of Evidence 801 and 802. The State contends that the testimony was proper as prior consistent statements used to rehabilitate Mr. Conaley's credibility.

Mr. Conaley was incarcerated with the Defendant at Northwest Correctional Center in 1993. He testified that the Defendant expressed his discontent that the victim had put him in prison. The Defendant told Mr. Conaley that the victim's son, Chris Ellsworth, was going to receive money from a lawsuit and that the Defendant felt entitled to some of the money.

Mr. Conaley said that prior to his leaving on furlough, the Defendant asked him to relay a message to the victim. The Defendant wanted the victim to know that he expected to receive some of the money from the lawsuit and that if he did not get it, he would kill her. Mr. Conaley said that he relayed the threat to Ms. Johnson. However, Mr. Conaley did not report the threat to the authorities, and he was released on parole shortly thereafter.

In January 1996, Mr. Conaley returned to custody. In February 1997, Mr. Conaley read about the victim's disappearance in a newspaper and told family members about the Defendant's prior statements, but Mr. Conaley did not contact law enforcement. However,

he said that approximately one week later, an MPD officer visited him in prison. He told the police about the Defendant's threatening the victim.

On cross-examination, Mr. Conaley admitted that when the Defendant made the statements in 1993, Mr. Conaley had already been granted parole and was awaiting release. However, he admitted that when he spoke with law enforcement in 1997, the information might have gained him an earlier release. Nevertheless, he denied contacting law enforcement, and he said that it was Ms. Johnson who told the police about the Defendant's threat after the victim disappeared. Mr. Conaley requested that he be transferred to the "annex" to finish his sentence, which he admitted was "easy time" in the prison system. He said that after talking to the police about the Defendant, he was moved to the annex.

Ms. Johnson testified that she was the victim's niece. She was also childhood friends with Mr. Conaley. She confirmed that in 1993, Mr. Conaley told her about the Defendant's threat against the victim.

Generally, out-of-court statements offered to prove the truth of the matter asserted are inadmissible evidence. *See* Tenn. R. Evid. 801, 802. However, when a defendant attacks a witness's credibility, the State may rehabilitate the witness by offering evidence of a prior consistent statement. *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). Admission of prior consistent statements is authorized in two circumstances: (1) where the statement is offered to rebut the implication that the witness's testimony was a recent fabrication; and (2) when deliberate falsehood has been implied. *Id.* Prior consistent statements are not ordinarily admissible for the sole purpose of bolstering a witness's credibility. *State v. Braggs*, 604 S.W.2d 833, 885 (Tenn. Crim. App. 1980).

During Mr. Conaley's cross-examination, the defense implied that Mr. Conaley fabricated the Defendant's statement in 1997 because he faced years in prison and wanted to secure favorable treatment and early release. Thereafter, the State called Ms. Johnson, who testified that Mr. Conaley relayed the Defendant's threat to her in 1993, when Mr. Conaley had already been granted parole and had no motivation to lie in order to cut a deal with police. That testimony was properly admitted to rebut the Defendant's implication of recent fabrication, and this issue is without merit.

The Defendant also contends that admission of this evidence "was in violation of the Fifth Amendment of the United States Constitution." The Defendant did not object on this basis at the trial and did not elaborate in his appellate brief as to how admission violated his constitutional rights. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Accordingly, our review is limited to plain error.

Because we have already determined that admission of Ms. Johnson's statement was proper under the Rules of Evidence, we conclude that the evidence was not admitted in violation of the Defendant's constitutional rights and that the Defendant has not established plain error. He is not entitled to relief on this basis.

## X. Chris Ellsworth's Testimony

The Defendant asserts that allowing Chris Ellsworth, the victim's son, to show the jury his scars violated Tennessee Rules of Evidence 401, 402, and 403. The State responds that the court acted within its discretion to allow the evidence, which demonstrated the victim was unlikely to abandon her son, who had been badly burned, and rebutted the defense's implication that the victim was not deceased. According to the State, the victim had provided extensive care to Mr. Ellsworth and would not have suddenly left.

At the trial, Mr. Ellsworth testified that he had been badly burned over 70% of his body in a water heater explosion and that he required extensive follow-up medical care. His mother was devoted to his care and frequently took him to LeBonheur Hospital as well as Shriners Hospital in Galveston, Texas, for treatment. She also worked with him daily on physical therapy for years after the accident. The State asked Mr. Ellsworth to show his scars to the jury. After the defense objected, the prosecutor explained that it wanted to show that the victim "was not the type of person that would have walked off without saying anything and leaving her children." The trial court agreed that the evidence was relevant, pointing out that the defense had said in its opening statement that the victim might not be deceased. The court agreed that the evidence did not have "a lot of probative value" under Rule 403 but that there was minimal danger of unfair prejudice. Thereafter, Mr. Ellsworth displayed the scars on his forearms to the jury.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The evidence was minimally relevant to support Mr. Ellsworth's testimony about the severity of his injuries and to combat the defense's argument that the victim might still be alive. The scars were a visual representation of the injuries described in the witness's testimony, and no evidence showed that the Defendant had any involvement in Mr. Ellsworth's injury. Despite the minimal relevance of the evidence, the Defendant has not articulated any prejudice he suffered based on the evidence's admission. The trial court

found that the probative value was not substantially outweighed by the danger of unfair prejudice, and the record supports its determination. The court did not abuse its discretion in allowing the jury to view the scars.

The Defendant asserts, in a cursory fashion, that admission of this evidence "was clearly done in violation of the Fifth Amendment of the United States Constitution," an assertion that he did not raise at trial. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We review this issue for plain error.

The Defendant has not established that admission of the evidence was prejudicial or improper. Likewise, we have considered his allegation of a constitutional error that violated his due process rights and have determined that it is without merit. The Defendant is not entitled to relief on this basis.

## XI. Tim Helldorfer's Testimony Regarding William Conaley and James Allard

The Defendant alleges that the trial court erred in allowing Sergeant Tim Helldorfer to testify regarding statements made by Mr. Conaley and Mr. Allard, in violation of Rules of Evidence 801 and 802. The State contends that the testimony was prior consistent statements used to rebut implications on cross-examination about the Defendant's threat and confessions.

Sergeant Helldorfer testified that he interviewed Mr. Conaley in prison and that he obtained a statement from Mr. Allard in Johnson County, Indiana in 1997. Sergeant Helldorfer stated that Mr. Allard's previous testimony was consistent with the 1997 statement.

The Defendant objected, arguing that the statements were hearsay and were prior consistent statements. He contended that admitting the statements because a witness's credibility had been generally impeached was not the proper use of a prior consistent statement. The State asserted that the witness's credibility became an issue on cross-examination and that it was proper to show they had "previously made these statements" to different individuals. The Defendant argued that Mr. Conaley's 1997 statement was fabricated and that the State could not provide a statement he made to someone else as proof that it was not a fabrication.

The trial court stated that "the jury has a right to hear that [Mr. Allard and Mr. Conaley] gave consistent statements to . . . the police . . . ." It explained that the statements were being offered to bolster the witness's credibility. The court provided the following example to explain his ruling:

If someone sees something, let's say they see someone run a light. And then they testify that they saw the person run the light.

And the other side says, he didn't run the light, did he?

Yes he did.

And then [the witness] tells ten other people later on that he ran the light. I think the other side -- the first side has a right to put on the witnesses because he made that statement that he ran the light to many, many people over and over. To show his credibility on the stand, the credibility of his testimony.

It's not being offered as substantive evidence. It's being offered to show his credibility, that he made that statement to several people.

The court allowed the officer to testify that Mr. Conaley's statements to police and at the trial were consistent. The court determined that the State could show Sergeant Helldorfer the transcript of Mr. Allard's trial testimony and ask whether it was consistent with Mr. Allard's statement to police. However, the contents of the transcript could not be admitted.

Out-of-court statements offered to prove the truth of the matter asserted are inadmissible at trial. *See* Tenn. R. Evid. 801, 802. However, when a defendant attacks a witness's credibility, the State may rehabilitate the witness by offering evidence of a prior consistent statement. *Benton*, 759 S.W.2d at 433. Admission of a prior consistent statement is authorized in two circumstances: (1) where the statement is offered to rebut the implication that the witness's testimony was a recent fabrication; and (2) when deliberate falsehood has been implied. *Id.* A prior consistent statement is not ordinarily admissible for the sole purpose of bolstering a witness's credibility. *Braggs*, 604 S.W.2d at 885.

Here, the trial court's comments reflect that the prior consistent statements were allowed merely to bolster the witness's credibility. The statements admitted through Sergeant Helldorfer were not made "before any improper influence or motive to lie existed." *State v. Herron*, 461 S.W.3d 890, 905 (Tenn. 2015) (citing *Sutton v. State*, 291 S.W. 1069, 1070 (Tenn. 1927)). The defense's cross-examination of these witnesses implied that the statements about the Defendant's threat were fabricated in an effort to gain favorable treatment from the State. The statements to the police were not made before the purported motive to fabricate existed. Therefore, they were not prior consistent statements, and the court erred in admitting the statements.

Recognizing that all errors are not equal, our supreme court has established three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error. *Powers*, 101 S.W.3d at 397; *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). The distinctions between these categories dictate the standards to be applied when determining whether a particular error is harmless. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). A trial court's error in admitting evidence under the Tennessee Rules of Evidence falls into the category of non-constitutional error, and harmless error analysis under Tennessee Rule of Appellate Procedure 36(b) is appropriate. *See State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014); *see also State v. James*, 81 S.W.3d 751, 763 (Tenn. 2002) (noting that "[h]armless error analysis applies to virtually all evidentiary errors other than judicial bias and denial of counsel"). Pursuant to Rule 36(b), the defendant bears the burden of showing that a non-constitutional error "more probably than not affected the judgment or would result in prejudice to the judicial process." T.R.A.P. 36(b); *Rodriguez*, 254 S.W.3d at 372.

The Defendant has not carried his burden in showing that he was prejudiced by admission of this evidence. Indeed, he has not offered any argument related to the prejudicial effect of this error. After considering the entirety of the evidence presented at the, we conclude that the error was harmless. The defense was able to cross-examine Mr. Conaley and Mr. Allard about their motivations to lie in exchange for more favorable treatment. The substance of the testimony was already in evidence, and the jury was instructed not to consider the consistent statements as substantive evidence. Further, overwhelming circumstantial evidence established the Defendant's guilt, including his previous relationship with the victim and motive for harming her, his threats to kill the victim, his confession to his cellmate, his possession of a car matching a description of the car seen at the motel, the presence in the car of blood and DNA matching the victim's, and his actions in the days following the victim's disappearance. Accordingly, the error was harmless, and the Defendant is not entitled to relief on this basis.

The Defendant also maintains that admission of this evidence violated the Fifth Amendment of the United States Constitution. He did not object on this basis at the trial and does not elaborate in his appellate brief as to how the Fifth Amendment was violated. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Our review is limited to plain error, and we conclude that the Defendant has not shown that the admission of this evidence affected a substantial right. The substantial right inquiry under the plain error doctrine mirrors the harmless error analysis under Rule 36(b). *See Maddin*, 192 S.W.3d at 562. Upon consideration, we conclude, as well, that admission of the evidence did not violate the Defendant's due process rights under the Fifth Amendment.

## XII. Trial Court's Limitation of Sergeant Helldorfer's Testimony

The Defendant contends that the trial court erred in limiting the defense's questioning of Sergeant Helldorfer. He argues that the defense should have been allowed to ask during cross-examination whether Billy Wayne Voyles had been positively identified. The Defendant further asserts that Sergeant Helldorfer should have been allowed to testify about a document relating to the release of the maroon Honda. The State responds that the defense agreed to the limitation on testimony about the positive identification and cannot now claim error. Further, the State asserts that the document was inadmissible because it could not be authenticated by the witness.

## A. Positive Identification

During its examination of Sergeant Helldorfer, the defense asked whether he was "aware that there was a positive identification made, that Billy Voyles was positively identified in the case." The prosecution objected to the question, arguing it was hearsay. The court overruled the objection because it was admissible as a prior identification but stated that there was a question as to whether a witness made a "positive" identification. Defense counsel then said, "I will take the word positive out if that is the problem." The court additionally noted that the Defendant needed to establish that the questioning was related to Mr. Darnell's identification of Mr. Voyles. The defense again agreed and asked Sergeant Helldorfer whether "Mr. Darnell had identified Billy Wayne Voyles as an eye witness as being on the scene at the time during [the] investigation." Sergeant Helldorfer answered affirmatively.

Tennessee Rule of Appellate Procedure 36(a) provides that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." The Defendant agreed to take the word positive out of the question posed to Sergeant Helldorfer, and he cannot now claim error on that basis. In any event, the Defendant has not explained how he was prejudiced by this limitation. Sergeant Helldorfer testified that Mr. Darnell identified Mr. Voyles as one of the men he saw in the motel office, and Mr. Darnell testified that he identified Mr. Voyles. The Defendant is not entitled to relief on this basis.

The Defendant also alleges that this limitation violated his Fifth Amendment rights under the United States Constitution. The Defendant did not raise this issue at the trial and does not provide any meaningful argument regarding this issue in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We review the issue for plain error and conclude that the Defendant has not proven this limitation amounted to a due process violation or that a substantial right was adversely affected. The defense sought to elicit testimony that Mr. Darnell identified Mr. Voyles as one of the men at the motel. The court

did not allow the defense to use the word "positive" when pursuing this line of questioning because Mr. Darnell had not used the word when he testified about the identification. The Defendant agreed to remove the word "positive" from his question. Deleting the word from the question did not meaningfully change the witness's testimony and had no effect on the outcome of the trial. The Defendant is not entitled to relief on this basis.

## B. Towing Slip

During cross-examination, the defense showed Sergeant Helldorfer three documents, one of which was a towing slip for the Honda. When asked whether he recognized them, he replied that he only recognized the towing slip. The Defendant questioned Sergeant Helldorfer about the two unidentified documents. The State objected, arguing that the witness had not authenticated the documents. In response, the defense asserted that the three documents were received together in discovery and that Sergeant Helldorfer's signature appeared on the towing slip. The defense asserted that one of the unidentified documents appeared to be the back of the towing slip, which had been authenticated by Sergeant Helldorfer. The defense explained that it was attempting to establish when the car was released and to whom, information that was reflected on one of the documents. However, Sergeant Helldorfer testified that the writing on the purported back of the towing slip was not his. He explained that he only wrote on the front of the towing slip and could not verify the information contained on the back. The trial court informed the Defendant that the witness had to authenticate the document purported to be the back of the towing slip before it could be admitted into evidence. Thereafter, the officer testified that his signature was on the towing slip, which reflected that the car was released on March 25. However, he did not have personal knowledge of where the car was taken after it was released. Because he could not identify the purported back of the towing slip, that document was not admitted into evidence.

Before a document is admitted into evidence, the party seeking admission generally must authenticate the document. *State v. Troutman*, 327 S.W.3d 717, 722 (Tenn. Crim. App. 2008); *See* Tenn. R. Evid. 901(a). Sergeant Helldorfer testified that he recognized the towing slip. However, he was unable to identify the document that the defense claimed was the back of the towing slip. The trial court did not abuse its discretion in refusing to admit the unauthenticated document, and this issue is without merit.

The Defendant again asserts a Fifth Amendment challenge to this issue, which was not a basis for objection at trial and is not adequately argued in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We review the issue for plain error and conclude that the Defendant has not established that the trial court's decision violated a clear and unequivocal rule of law. Because there was no error in the court's decision to exclude this evidence based on a lack of authentication, the allegation of a constitutional error is without merit. The Defendant is not entitled to relief on this basis.

## XII[I]. Joyce Carmichael's Testimony

Joyce Carmichael is the official records officer for the Tennessee Department of Correction. Ms. Carmichael testified that Tommy Voyles and the Defendant were both incarcerated at Lake County Regional Correctional Facility during a five-month period in 1992. Later in the trial, another witness testified that Tommy and Billy Voyles were related and that the witness had seen them together, although the witness did not specify how they were related. Before her testimony, the defense objected to the relevance of evidence that Tommy Voyles had been incarcerated with the Defendant previously. The prosecutor argued that there was more than one person involved in the victim's disappearance and that Tommy Voyles might have been involved. Thus, the State wanted to show the connection between the Defendant and Tommy Voyles. The defense pointed out that the only testimony regarding Tommy Voyles was that he had been previously married to the victim. The State further explained that "there appear to be multiple people involved in this" and that one of the individuals involved was identified by a witness as Billy Voyles. Thus, argued the State, "the fact that [the Defendant] has a close connection with a Tommy Voyles would be relevant." The trial court admitted the testimony, noting that it was "not extremely probative but there's absolutely no unfair prejudice."

The evidence does not support the trial court's determination that evidence attempting to connect the Defendant with Tommy Voyles was relevant. The evidence was too remote to be relevant to a material issue in the case. Tenn. R. Evid. 401 and 402. There was testimony that Tommy Voyles and the Defendant had been incarcerated in the same facility but not that they knew each other, were housed together, or interacted in any capacity during that time. Even if a "close connection" between the Tommy Voyles and the Defendant were proved, that connection does not result in a conclusion that a connection existed between the Defendant and Billy Voyles. The court's admission of this irrelevant evidence was error, but we conclude that the error was harmless based upon the overwhelming circumstantial evidence of the Defendant's guilt. *See* Tenn. R. App. P. 36(b). The Defendant is not entitled to relief on this basis.

## XIV. Prior Testimony of Unavailable Witnesses

The Defendant contends that the trial court erred in allowing previous testimony from witnesses, along with related exhibits, who were unavailable at the second trial. He alleges that the admission of this testimony was unfair because the witnesses were questioned by his previous counsel, who were found to be constitutionally ineffective. The State responds that each of the unavailable witnesses was subject to cross-examination and that counsel from the Defendant's first trial were not ineffective in questioning witnesses.

Pursuant to Tennessee Rule of Evidence 804(b), the former testimony of a declarant who is currently unavailable to testify is admissible. "Former testimony" is "[t]estimony given as a witness at another hearing of the same or a different proceeding . . ., if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1). The similar motive requirement is met when the issues in the present case are "sufficiently similar" to the issues in the case in which the prior testimony was given. *See State v. Howell*, 868 S.W.2d 238, 252 (Tenn. 1993). The Constitution of the United States provides the accused in a criminal prosecution the right "to be confronted with witnesses." U.S. Const. amend. VI.; *see also* Tenn. Const. art. I, § 9. However, "the Confrontation Clause only guarantees 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). Our courts have upheld the admission of prior testimony given at a preliminary hearing, *see State v. Bowman*, 327 S.W.3d 69, 88-89 (Tenn. Crim. App. 2009), and in another state, *see Howell*, 868 S.W.2d at 252.

The prior testimony of eight witnesses was read into evidence at the Defendant's trial. With the exception of one witness, the prior testimony was from either the Defendant's preliminary hearing or his first trial. The exception was the testimony of Dixie Presley, who testified at the previous trial and at the Defendant's post-conviction evidentiary hearing. The post-conviction court determined that trial counsel were ineffective for failing to cross-examine Ms. Presley about the two men she saw at the motel on the night of the victim's disappearance. However, she was specifically questioned about this matter at the post-conviction hearing, and this testimony was read into evidence at the Defendant's second trial. Therefore, any failure to effectively cross-examine Ms. Presley at the first trial was satisfied by her questioning at the post-conviction hearing and the subsequent introduction of this evidence at the second trial.

The record reflects that the Defendant had an opportunity to, and in fact did, cross-examine each witness. The Defendant had a similar motive to develop the testimony of these witnesses during examination in the prior proceedings in which he was facing the same charges. Other than the exception discussed above, the Defendant was granted post-conviction relief on the basis that his counsel were ineffective in investigating the case, not in examining witnesses. The Defendant has not cited any cases holding that prior testimony is inadmissible when post-conviction relief is granted for a reason unrelated to counsel's examination of witnesses. Accordingly, he is not entitled to relief on this basis.

The Defendant also argues that admission of this prior testimony violated his Fifth Amendment rights. He did not object on this basis at trial and does not elaborate on this

issue in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We review the issue for plain error.

Because we have determined that admission of the prior testimony was proper, we conclude that the Defendant has not shown that his due process rights were violated in this respect. No clear and unequivocal rule of law was breached, and the Defendant is not entitled to relief on this basis.

## XV. Admission of Richard Rimmer's Prior Inconsistent Statements

The Defendant alleges that the trial court should not have admitted Richard Rimmer's prior inconsistent statements and related exhibits as substantive evidence. The State asserts that this evidence was properly admitted as a prior inconsistent statement and as past recollection recorded.

At trial the Defendant's brother, Richard Rimmer, testified that he could not recall giving a statement to the police in 1997. The State showed Mr. Rimmer a copy of a statement dated February 18, 1997, and although he recognized his signature on the statement, he did not remember giving the statement. The prosecutor asked Mr. Rimmer about each question and answer provided in the statement. In two instances, he denied providing a particular answer, but he mostly stated that he had no memory of the statement. He testified that he had suffered several head injuries, which impacted his memory. The State also showed him drawings he allegedly made, but he denied making the drawings.

The State sought to have the statement and drawings admitted as substantive evidence under Tennessee Rule of Evidence 803(26). The trial court found that for the statements Mr. Rimmer denied making, they were prior inconsistent statements under Tennessee Rule of Evidence 613(b) and were admissible, if the court found they were trustworthy, pursuant to Rule 803(26), providing a hearsay exception for prior inconsistent statements. For the statements Mr. Rimmer did not remember making, the court found that he was an unavailable witness pursuant to Rule of Evidence 804(a)(3), and those questions and answers could be read to the jury. Both sides presented testimony relevant to competency at the time the statement was given.

The defense called Mr. Rimmer's mother, Sandra Rimmer, who testified that Mr. Rimmer had received disability benefits since 1990 or 1991 due to a head injury that caused brain damage. She stated that his daily activities were impacted and that he "sometimes . . . thinks things are happening [that were] not happening." Ms. Rimmer admitted that in 1997, Mr. Rimmer was capable of living on his own, managed daily activities without assistance, and worked to support himself. She also said he was competent to enter into a lease agreement.

The State called Sergeant Helldorfer, who testified that he met with Mr. Rimmer on February 13 and 18, 1997. His impression was that Mr. Rimmer fully understood the questions asked and answered them appropriately. Sergeant Helldorfer said that he did not ask leading questions and that Mr. Rimmer provided the details. The February 18 conversation was memorialized in a written statement. The officer also testified about Mr. Rimmer's drawings. One drawing depicted the location of the blood in the backseat, and the other was a drawing of the shovel, of which the Defendant asked Mr. Rimmer to dispose. Sergeant Helldorfer confirmed that the statement and drawings about which Mr. Rimmer had been questioned were those obtained by Sergeant Helldorfer on February 18, 1997.

In assessing whether the evidence was trustworthy, the trial court noted the level of detail contained in Mr. Rimmer's answers. The court further found that the statement appeared to come from a competent person and not from someone who was intellectually disabled. The court determined that the statement was given under circumstances indicating its trustworthiness.

The trial court determined that the statements Mr. Rimmer denied making were admissible pursuant to Rule 803(26). The court further ruled that the drawings could be admitted into evidence, as Mr. Rimmer had denied making them. However, as to the statements for which Mr. Rimmer claimed a lack of memory, the court found those were not inconsistent statements and could not be admitted under 803(26). Rather, the court found that portions of the statement qualified as a past recollection recorded pursuant to Rule 803(5). Thus, those portions could be read into evidence but not admitted as an exhibit.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. However, many exceptions to the rule against hearsay exist. Tennessee Rule of Evidence 803(26) provides that a prior inconsistent statement that is otherwise admissible under Rule 613(b) is admissible as substantive evidence if the following prerequisites are met:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

This rule has been interpreted to apply when a testifying witness claims a lack of memory. *State v. Davis*, 466 S.W.3d 49, 64 (Tenn. 2015).

Tennessee Rule of Evidence 613(b) permits the use of extrinsic evidence of prior inconsistent statements for the purpose of impeachment. The Rule provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

Additionally, Rule 803(5) provides another exception to the hearsay rule, which is commonly referred to as past recollection recorded. That rule deems admissible

[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

The Defendant alleges that Mr. Rimmer's prior statement should have been considered by the jury for impeachment purposes only. However, Rule 803(26) provides that an inconsistent statement may be admitted as substantive evidence when certain conditions are satisfied. Mr. Rimmer testified at the trial that the statement was written and signed by him, and the trial court conducted a jury-out hearing during which it determined the statement was trustworthy. The court did not err by admitting the prior statement pursuant to Rules 613(b) and 803(26). Additionally, the statement was properly admitted as a recorded recollection under Rule 803(5). The statement was taken shortly after the events in question, and Mr. Rimmer no longer remembered the statement. Further, the court allowed the statement to be read into evidence but did not admit it as an exhibit. Accordingly, Mr. Rimmer's prior statement was admissible under 803(26) and 803(5), and the Defendant is not entitled to relief on this issue.

The Defendant again asserts a general Fifth Amendment challenge to the admission of this evidence, although he did not object on that basis at trial and does not provide

meaningful argument on the issue in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Our review is limited to plain error. In that regard, we conclude that the Defendant has not established that he is entitled to plain error relief.

## XVI. Kenneth Falk's Testimony

The Defendant argues that the trial court erred in prohibiting the testimony of attorney Kenneth Falk regarding the success of a lawsuit concerning conditions at the Johnson County Jail in Indiana. The State responds that the evidence was properly excluded as it was irrelevant.

The Defendant offered the testimony of Mr. Falk to establish that the Defendant's escape attempts were related to the conditions at the jail and did not reflect a consciousness of guilt. The State objected on relevancy grounds. The trial court allowed the testimony to rebut the implication that his escapes were based on guilt. However, the court prohibited Mr. Falk from testifying about any details the Defendant discussed with him.

Mr. Falk testified that was legal director of the American Civil Liberties Union (ACLU) of Indianapolis, Indiana. He said that in 1997, the Defendant contacted his office concerning the conditions at the Johnson County Jail. His office filed a lawsuit based on the Defendant's complaints, although it was filed on behalf of other inmates because the Defendant was no longer confined in the jail by the time the lawsuit was filed. When the defense asked Mr. Falk whether the lawsuit was successful, the State objected. The trial court sustained the objection, stating there was no need "to talk about what happened in the lawsuit."

The trial court did not abuse its discretion in limiting Mr. Falk's testimony. The defense's stated purpose in offering the evidence was to provide a reason, other than guilt, for the Defendant's escape attempts. Mr. Falk established that the Defendant complained about the conditions and that a lawsuit was filed as a result. The court did not abuse its discretion in limiting the details of the lawsuit, including whether it was successful. The Defendant is not entitled to relief on this basis.

The Defendant maintains that excluding this evidence violated the Fifth Amendment of the United States Constitution. He did not object on this basis at trial and does not elaborate on the issue in his brief. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Thus, our review is limited to plain error.

To determine whether the exclusion of this testimony to the level of a constitutional violation, we consider the following: (1) whether the evidence is critical to the defense, (2)

whether it bears sufficient indicia of reliability, and (3) whether the interest supporting exclusion is substantially important. *See Brown*, 29 S.W. 3d at 433-34.

The Defendant has not proven that the evidence was critical to his defense, and therefore, no substantial right was adversely affected. As noted above, the Defendant was able to establish through Mr. Falk's testimony that conditions at the jail led the ACLU to file a lawsuit, which provided an alternative reason for the Defendant's escape attempt. We cannot conclude that additional testimony that the lawsuit was successful would have changed the outcome of the trial. Accordingly, plain error relief is not warranted.

## XVII. Marilyn Miller's Testimony

The Defendant asserts that the trial court erred in not allowing Marilyn Miller to give an opinion on the length of time that the maroon Honda should have been kept by law enforcement. He alleges that her testimony would have supported his request for a *Ferguson* jury instruction. He claims that exclusion of this testimony violated Rules of Evidence 401 and 402. The State contends that the exclusion was proper and argues that the decision to provide a *Ferguson* instruction was a question of law for the court and that Dr. Miller's testimony would not have assisted the jury. The State further responds that the proffered testimony was outside the scope of Dr. Miller's expertise.

Dr. Miller testified that she was an associate professor of forensic science at Virginia Commonwealth University. She had a bachelor's degree in chemistry, a master's degree in forensic chemistry, and a doctorate in education. Before teaching, she spent fourteen years working as a forensic scientist and a crime scene investigator for three law enforcement agencies. Her duties included responding to and investigating crime scenes and analyzing evidence in a laboratory. She had taught for twenty-two years in the field of forensic science and crime scene investigation. The trial court admitted Dr. Miller as an expert in crime scene investigation, crime scene reconstruction, forensic science, and serology and blood spatter analysis.

The defense asked Dr. Miller whether she had an opinion regarding the length of time the maroon Honda should have been retained by law enforcement. The State objected, and the trial court sustained the objection. The court acknowledged that Dr. Miller was a crime scene expert but found that it was improper for her to give an opinion about the duty to preserve evidence as it related to *Ferguson*.

The Defendant asserts that this limitation violated Rules of Evidence 401 and 402. As previously discussed, Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

evidence." Rule 402 provides, in part, that "[e]vidence which is not relevant is not admissible."

The Defendant contends that Dr. Miller's testimony would have assisted the jury in understanding "that the defense was not given ample opportunity to inspect and test the maroon Honda." However, we agree with the State that this matter was relevant to whether there was a duty to preserve, and that was an issue solely within the purview of the trial court. Accordingly, the court did not abuse its discretion in ruling the testimony was inadmissible.

The Defendant contends that exclusion of this evidence violated the Fifth Amendment. Because he did not raise this issue at trial and does not provide argument regarding this issue in his appellate brief, our review is limited to plain error. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). We conclude that the Defendant failed to meet his burden in proving that exclusion of Dr. Miller's testimony violated a clear and unequivocal rule of law. The evidence was not critical to the defense because the issue of the duty to preserve evidence is a matter of law for the trial court's determination. Dr. Miller's testimony would not have assisted the jury in its resolution of any issue in the case. The Defendant is not entitled to relief on this basis.

## XVIII. Documents Related to Lawsuit against Shelby County Jail

Next, the Defendant asserts that the trial court should have admitted into evidence another prisoner's affidavit about the prisoner's experiences in the Shelby County Jail and about a 2000 contempt order. The State disagrees, arguing that these documents lacked probative value because they related to the jail's conditions when the Defendant was no longer confined there and that the affidavit was inadmissible hearsay.

Attorney Robert Hutton testified that in 1996 or 1997 he filed a lawsuit against the Shelby County Jail, alleging that jail conditions violated the Eighth Amendment to the United States Constitution. Shelby County stipulated that the conditions were unconstitutional and agreed to make changes to the facility. The defense attempted to admit several documents related to the lawsuit, and the State objected. One of the documents was described as a contempt order, which contained "graphic, specific instances, everything from smack down tournaments . . . to gang rapes." The State argued that no evidence reflected that the Defendant had personal knowledge of these activities and that it was irrelevant to show why he attempted to escape. The State also noted that several of the documents pertained to times when the Defendant was no longer confined at the jail. The defense argued that the documents described the jail as a "hell hole" and that the documents were relevant to establishing the Defendant's state of mind at the time of the attempted escape.

- 71 -

The trial court found that the general information relating to the conditions at the jail and the county's admission that they were unconstitutional were admissible. It excluded evidence of specific instances of conduct at the jail, unless the Defendant could establish a link between himself and the conduct. The court stated that the Defendant had "a right to show that the jail conditions were bad, as a possible reason that he might escape, but as far as showing that some gang member raped some other gang member in the jail, . . . that is far [afield]." Thus, the court permitted the defense to present the consent order in which Shelby County admitted the conditions were unconstitutional but not the additional litigation documents because "the majority of which took place when [the Defendant] was not in [the] jail."

The purpose of the evidence was to provide a reason for the Defendant's attempted escape other than a consciousness of guilt. Mr. Hutton's testimony and the consent order established that conditions at the jail were unconstitutional and that the County agreed to make changes. The excluded documents generally detailed specific instances of violence and sexual assault, but the incidents were not connected to the Defendant, and he did not establish the excluded documents relevance. Therefore, the trial court did not abuse its discretion by prohibiting the admission of the relevant documents, and the Defendant is not entitled to relief on this basis.

The Defendant asserts that the exclusion of this evidence was a violation of the Fifth Amendment of the United States Constitution. He did not assert that issue at trial, and his cursory treatment of the issue in his brief qualifies it for waiver. *See Adkisson*, 899 S.W.2d at 634; Tenn. Ct. Crim. App. R 10(b). Our review is limited to plain error. We conclude that the specific instances of conduct the Defendant sought to introduce were not critical to the defense because nothing connected the Defendant's experience at the jail to the unconstitutional conduct. Accordingly, the trial court's exclusion did not affect the outcome of the trial. The Defendant has not established plain error and is not entitled to relief on this basis.

## XI[X]. Non-Capital Sentencing

Finally, the Defendant raises one sentencing issue related to the application of an aggravating factor relative to his aggravated robbery conviction. He asserts that proof did not support a finding that he was a leader in the offense and that the trial court erred by applying this factor and ordering the sentence for aggravated robbery to be served consecutively to the death sentence. The State responds that the Defendant has waived this issue for failing to include a transcript from this portion of the penalty phase. Alternatively, the State asserts that the evidence supported application of the enhancing factor.

As the appellant, it was the Defendant's burden to prepare an adequate record for appellate review. *See State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). In the absence of an adequate record, this court must presume that the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993); *see also State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993) (holding that when the appellant contends that the sentence is excessive but does not include a transcript from the sentencing hearing, the issue of excessive sentences will be considered waived); Tenn. R. App. P. 24(b).

Without a transcript of the non-capital sentencing hearing, this court cannot evaluate the trial court's application of the enhancement factor, and we presume the court's action was correct. The Defendant is not entitled to relief on this basis.

## X[X]. Mandatory Review

[Omitted]

[CONCLUSION]

[Omitted]